998 P.2d 897 (2000)
100 Wash.App. 776
STATE of Washington, Respondent,
v.
Jeremy Mark READ, Appellant.
No. 17942-7-III.
Court of Appeals of Washington, Division 3, Panel Nine.
May 9, 2000.
*899 David B. Koch, Nielsen, Broman & Associates, Seattle, for Appellant.
Douglas J. Shae, Deputy Prosecuting Attorney, Wenatchee, for Respondent.
*898 KATO, J.
Jeremy Mark Read, a juvenile, appeals his convictions for second degree murder, first degree assault, and unlawful possession of a firearm. He contends a medical expert and lay witnesses improperly were permitted to give their opinions of his guilt. He also contends the court violated double jeopardy by convicting him of both murder and assault. We affirm the murder and possession convictions. But because we agree the convictions for both murder and assault violated double jeopardy, we vacate the assault conviction and remand for resentencing.
Mr. Read shot and killed Bruce Larson Jr. in a Wenatchee motel room on May 3, 1998. He was charged with second degree murder, first degree assault, and unlawful possession of a firearm. At trial, Mr. Read testified he pulled the gun to protect himself, and it fired by accident. He denied he intended to hurt or shoot anybody.
After a bench trial, the court rejected Mr. Read's defenses of justifiable or excusable homicide and found he intended to kill Mr. Larson. The court thus found Mr. Read guilty of second degree murder and first degree assault. Based on evidence Mr. Read was a convicted felon at the time of the shooting, the court also found him guilty of unlawful possession of a firearm.
The court sentenced Mr. Read to concurrent terms of 335 months for the murder conviction, 244 months for the assault conviction, and 48 months for the unlawful firearm possession conviction.[1]
First, we consider whether the trial court abused its discretion by permitting a medical expert to testify about the circumstances of the shooting. The State's first witness at trial was Dr. Gerald Rappe, a pathologist and Chelan County coroner. Dr. Rappe gave the findings of his autopsy of Mr. Larson's body. The prosecutor then asked Dr. Rappe several questions about the angle of the bullet as it entered the body. The witness further testified:
A Basically to hurry it along, Your Honor, the gun has to be up. I mean up at approximate eye level of the person who's doing the shooting. I mean we aren't talking about a gun down here, Your Honor. We're talking about a gun up here.
Q So you're indicating that when you say gun down here, you're waving around the waist line. It's not a scenario where a gun would just go off automatically or accidentally when somebody pulls it out; is that correct?
The court overruled a defense objection, and the testimony continued:
Q ... Please continue, Doctor. Do you have an opinion as to how this gun was aimed when it entered into the defendant's  or excuse me, the victim's body?
A Yes, I do. The basic thing here is that the gun was fully up and that there was  and that it is reasonable that the decedent was sighting right down the gun when it went off.
. . . .
*900 Q Doctor, do you have an opinion as to how far the gun was from Mr. Larson when he was shot?
A I have an opinion of  I have an opinion of a minimum distance that it had to be away. That's what I have.
Q Okay. What's your basis of that opinion?
A The basis of that opinion is that you noted, Your Honor, that where I placed the shot going in  and I have been told, Your Honor, that he had on a shirt that would have exposed virtually all of his neck and  well, first of all, I know it's not a contact wound. I know it's not a near contact because I would have seen characteristics in the entrance wound itself regardless of the fact that he had  that it may have gone through some fabric, I would have seen characteristics to tell me that so we're not dealing with contact and we're not dealing with near contact. So we're dealing with close or we're dealing with distant. Now, since it was so close to the top of the shirt, I should have seen  if it was within 18 inches to two feet, I should have seen some stippling of powder on his neck where the shirt was not protecting his skin. I saw none so my opinion is that the end of the barrel  not where the two were standing, Your Honor, but the end of the barrel was at least 18 inches to two feet away from the person who was shot.
On cross examination, Dr. Rappe admitted he had not examined the shirt Mr. Larson wore at the time of the shooting. The testimony continued:
Q Doctor, I guess re-enacting your re-enactment here, a little stage play. Could you step out. Now, I notice that Mr. Shae [the prosecutor] when he was doing this was standing very upright. Could you tell from any of your examination of Mr. Larson the angle of his body when the bullet hit?
A Only one thing I could say with reasonable accuracy about the angle of his body and that's that he was probably leaning forward a little bit. That's the only thing that I can say with accuracy because what you said before is exactly true. You don't know anything else about how he was rotating.
Q All right. So if he was  say you're holding a gun. Hold it at whatever level but if you are holding a gun and if you were shooting me and I was standing upright, then your hypothesis is the gun had to be way up high?
A Yeah, if he was standing up like this, then the gun would have to be here.
Q So your height is what?
A Five eight.
Q Okay. So I'm six feet so that's a little bit more difference between, say, Mr. Read and Mr. Larson but not too much. So if we were  you said three to four feet so if this is about four feet here, the angle would have to be  the gun would have to be held about straight above your head. The closer though that I was to you, the lower the gun would be, correct?
A Correct.
Q And also the more I was leaning forward, the lower the gun could be, correct, so if I'm like this, the gun could be at this height, correct, assuming 12 or 10 degrees?
A Bend over a little more. Yes, you're exactly right, yes.
Q And there's no way  so this 18-inch minimum that you stated, that's based on not having an opportunity to see the shirt and not knowing where the shirt was, if it was pulled up or pulled down or the style of shirt, anything else, correct?
A That's absolutely correct.
ER 702 permits an expert to testify "in the form of an opinion or otherwise." The decision whether to admit expert testimony is within the trial court's discretion. State v. Swan, 114 Wash.2d 613, 655, 790 P.2d 610 (1990), cert. denied, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991). Mr. Read appears to raise three issues regarding Dr. Rappe's testimony.
*901 First, he contends the testimony was improper opinion evidence. Opinion testimony is admissible even if it "embraces an ultimate issue to be decided by the trier of fact." ER 704. However, "[n]o witness, lay or expert, may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference." State v. Black, 109 Wash.2d 336, 348, 745 P.2d 12 (1987). An opinion by either an expert or a lay witness on the ultimate question of a defendant's guilt violates his constitutional right to an impartial trial, including the independent determination of the facts by a judge or jury. State v. Carlin, 40 Wash.App. 698, 701-02, 700 P.2d 323 (1985), overruled on other grounds by City of Seattle v. Heatley, 70 Wash.App. 573, 854 P.2d 658 (1993), review denied, 123 Wash.2d 1011, 869 P.2d 1085 (1994).
Mr. Read contends Dr. Rappe inferentially expressed an opinion about the validity of his defenses, and thus his guilt, by testifying he was "sighting right down the gun when it went off." But while Dr. Rappe's testimony certainly cast doubt on Mr. Read's version of the events, it was not a direct or indirect opinion as to the validity of his defenses. Even after the testimony, the trial judge still had to decide (1) whether to believe Mr. Read's testimony, and (2) the ultimate issue whether he shot Mr. Larson by accident or in self-defense. See State v. Cruz, 77 Wash. App. 811, 815, 894 P.2d 573 (1995). The testimony was not an improper expression of Mr. Read's guilt.
Second, Mr. Read contends there was insufficient foundation for the testimony. He apparently contends that, because Dr. Rappe was the State's first trial witness, there was no evidence regarding the relative positions of Mr. Read and Mr. Larson at the time of the shooting. "The facts or data ... upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." ER 703. An expert may give an opinion "without prior disclosure of the underlying facts or data, unless the judge requires otherwise." ER 705. Under these rules, expert opinions may be admitted "without any recitation of the expert's factual data, hypothetically or otherwise." 5B Karl B. Tegland, Washington Practice, Evidence § 705.2, at 254 (4th ed.1999). "[M]odern evidence rules permit an expert to state an opinion without prior disclosure of the underlying facts, leaving to the opposing party the responsibility of questioning the basis of the opinion." Cornejo v. State, 57 Wash.App. 314, 329, 788 P.2d 554 (1990). Here, defense counsel on cross examination was free to, and did, challenge the factual assumptions underlying Dr. Rappe's opinion.
Third, Mr. Read contends the court should have excluded Dr. Rappe's testimony under ER 403 because its probative value was outweighed by the danger of unfair prejudice. However, evidence is not inadmissible under ER 403 simply because it is detrimental or harmful to the interests of the party opposing its admission; it is unfairly prejudicial only if it has the capacity to skew the truth-finding process. See State v. Hudlow, 99 Wash.2d 1, 12-13, 659 P.2d 514 (1983). Dr. Rappe's testimony certainly was harmful to Mr. Read's case, but it was not unfairly prejudicial because it did not appeal to jurors' sympathies, provoke their instincts to punish, or "`trigger[] other mainsprings of human action.'" See Carson v. Fine, 123 Wash.2d 206, 223, 867 P.2d 610 (1994) (quoting 1 Jack B. Weinstein & Margaret A. Berger, Evidence § 403[03], at 403-36 (1985)).
The court did not abuse its discretion in allowing Dr. Rappe's opinion testimony.
Second, we consider whether the trial court, sitting as factfinder in this bench trial, abused its discretion by permitting several lay witnesses to give their opinions as to the validity of Mr. Read's self-defense claim.[2] This issue relates to the testimony of three eyewitnesses. Joshua Walsh testified:
Q And what did Bruce do, do you recall?
*902 A He was sitting on the bed and when somebody said something, he got up and said, don't get smart. He didn't jump or nothing, just stood up and took a step toward [Mr. Read] and that was it.
Q Was it a big step or 
A No, it was just a normal step.
Q Did he threaten him? Did he rush him?
A Not to my knowledge. He didn't look like he was threatening him or anything.
Q Was there any reason for Mr. Read at that point to defend himself?
A No.
MR. ZANOL [defense counsel]: Objection.
MR. SHAE [prosecutor]: I think he can answer that question, Your Honor. That's one of the elements of this particular crime.
THE COURT: I'll overrule.
Q Did Chad threaten him or anything like that?
A Not to my knowledge, no.
Q Did anybody threaten Mr. Read in that room that night?
A No.
Q Did Chad  did you see Bruce  did he have any weapons or anything in his hand?
A No.
. . . .
Q Was it surprising to you that someone would react in this way?
A Yeah. This is the first time I've ever seen anything happen like that.
Q Was there any reason for Mr. Read to pull this weapon out?
A No.
Q Was there any reason for Mr. Read to, after he pulled it out, shoot it?
A No.
Kim McIntosh testified:
Q Did you see anything in [Bruce Larson's] hands?
A No.
Q Did he have any weapons?
A No.
Q Did he threaten anybody?
A No.
Q Did he run at anybody?
A No.
Q Did Mr. Read have to pull out a weapon at that time?
A No.
Q Could he have turned around and walked out of that room?
A Yes.
Q Did he have to shoot Mr. Larson?
A No.
Q Did anybody threaten Mr. Read?
A No.
Q Did anybody make him defend himself?
A No.
Ms. McIntosh later testified:
Q Was there anything else in [Mr. Larson's] hands?
A No.
Q And you said that he was  his hands were out like this; is that correct?
A Mm-hmm.
Q And if I said to you something like, I don't understand or why are we here today or I don't understand what you're saying, and I put my hands out like that, does that mean I'm challenging you?
A No.
Q And you just  for whatever reason you have decided that that's a challenging way?
A Yeah.
Q Could it also  could [Mr. Larson] have also just as likely sat back down on the bed?
A Yeah.
Q And could Mr. Read just as likely walked out of that room?
A Yeah.
Q And was there any reason why, with Mr. Larson standing there like this, that he needed to be shot?
A No.
*903 Q Anything that Chad [Mr. Larson's brother] said in a rude manner, even if he was speaking rudely, that would cause Mr. Read to shoot his brother?
A No.
Veronica Flom testified:
Q Is there any reason that you could see why Mr. Larson should be shot that night?
A No.
Q Was there any reason that anybody needed to defend themself [sic] in that manner?
A No.
Q Was there any reason that anybody needed to defend them themself [sic] in any manner?
A No.
Opinion testimony by a lay witness must be "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." ER 701. As with expert witnesses, a lay witness may not give an opinion, either directly or by inference, as to a defendant's guilt. State v. Black, 109 Wash.2d 336, 348, 745 P.2d 12 (1987). Violation of this rule also violates the defendant's constitutional right to an impartial trial. Carlin, 40 Wash.App. at 701-02, 700 P.2d 323.
Mr. Read contends the quoted testimony of all three witnesses violated these rules. In fact, however, some of the questions and answers were fact-based and entirely proper. For example, the prosecutor did not solicit improper opinions by asking if anyone threatened Mr. Read, if Mr. Larson had anything in his hands, or if Mr. Larson made any movement toward Mr. Read. On the other hand, several other questions appear to have crossed the line. These questions went beyond mere perceptions of the witnesses and addressed the very heart of Mr. Read's self-defense claim. For example, the prosecutor sought improper opinion evidence by asking Mr. Walsh if there was "any reason for Mr. Read at that point to defend himself"; by asking Ms. McIntosh if Mr. Read "ha[d] to pull out a weapon at that time," if he "ha[d] to shoot Mr. Larson," if "anybody ma[d]e him defend himself," or if there was any reason why Mr. Larson "needed to be shot"; and by asking Ms. Flom if there was any reason why Mr. Larson was shot or for Mr. Read to defend himself. These questions solicited opinions that, at least by inference, went directly to the validity of Mr. Read's defense, and thus his guilt.
It is true, as the State points out, that the State bears the burden of proving the absence of self-defense beyond a reasonable doubt. See State v. McCullum, 98 Wash.2d 484, 491-96, 656 P.2d 1064 (1983). But this burden does not justify the State's resort to improper opinion evidence. The prosecutor's other questions in this case suggest some proper ways it could elicit factual evidence in satisfaction of its burden of proof. The lay witnesses' opinions in this case were improper.
A separate question, however, is whether the convictions should be reversed because of the improper opinions.
The action was tried to the court sitting without a jury. In such instances a liberal practice in the admission of evidence is followed in this state, supported, as it is, with a presumption on appeal that the trial judge, knowing the applicable rules of evidence, will not consider matters which are inadmissible when making his findings. State v. Bell, [59 Wash.2d 338, 352, 368 P.2d 177, cert. denied, 371 U.S. 818, 83 S.Ct. 34, 9 L.Ed.2d 59 (1962)]. And, in nonjury proceedings a new trial ordinarily will not be granted for error in the admission of evidence, if there remains substantial admissible evidence to otherwise support the trial court's findings. State v. Ryan, 48 Wash.2d 304, 293 P.2d 399 (1956).
State v. Miles, 77 Wash.2d 593, 601, 464 P.2d 723(1970).
Under this rule, the court, sitting as the trier of fact, is presumed not to have considered the inadmissible lay opinions. But Mr. Read contends the presumption is rebutted in two ways.
First, he contends the court demonstrated its intent to consider the improper opinions by overruling defense counsel's objection. *904 But the ruling, without explanation, did not demonstrate any intent to rely improperly on the opinions. Rather, it was an instance of the liberal practice in the admission of evidence in bench trials. The court's decision to hear the evidence does not suggest it considered it improperly.
Second, Mr. Read contends the written findings demonstrate that the court relied on the improper opinions.[3] The court "found" that one witness testified Mr. Read "did not have to defend himself." And the court "found" that Ms. McIntosh "indicated that she thought there might be a fight but that Mr. Read did not have to shoot or kill Mr. Larson." These "findings" do not show the court was influenced by the witnesses' opinions. Among the factual questions related to a self-defense claim is whether the defendant reasonably believed he was in imminent danger of harm from the victim. State v. LeFaber, 128 Wash.2d 896, 899, 913 P.2d 369 (1996). The factfinder "should put itself in the shoes of the defendant to determine reasonableness from all the surrounding facts and circumstances as they appeared to the defendant." Id. at 900, 913 P.2d 369. The witnesses' subjective opinions about whether they believed there was an imminent danger of harm to Mr. Read bore directly on a question the court, as factfinder, was required to resolve. While the opinions may have been improper in a jury trial, the trial court here certainly was capable of limiting its consideration to this proper purpose.
Mr. Read has failed to rebut the presumption that the trial judge, sitting as factfinder, understands the court rules and will not consider inadmissible evidence. Mr. Read thus was not prejudiced by the witnesses' improper opinions. Moreover, even without the objectionable evidence, there is substantial other evidence supporting the trial court's findings. See Miles, 77 Wash.2d at 601, 464 P.2d 723. The error thus was harmless.
Third, we consider whether the convictions for second degree murder and assault violated the double jeopardy clauses of the federal and state constitutions. RCW 9A.32.050 provides in pertinent part:
(1) A person is guilty of murder in the second degree when:
(a) With intent to cause the death of another person but without premeditation, he causes the death of such person or of a third person; or
(b) He commits or attempts to commit any felony other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime or in immediate flight therefrom, he, or another participant, causes the death of a person other than one of the participants.
Count I of the information charged Mr. Read alternatively with violation of either subsection (a) (intentional killing) or subsection (b) (felony murder).[4] Count II charged Mr. Read separately with first degree assault under RCW 9A.36.011(1)(a), which requires that a person, "with intent to inflict great bodily harm ... [a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death."
Mr. Read was convicted of both counts. The court's written findings and conclusions indicate the court found Mr. Read killed Mr. Larson intentionally, and thus found him guilty of second degree murder under RCW 9A.32.050(1)(a).[5] Mr. Read contends *905 the convictions for both second degree intentional murder and first degree assault violate the double jeopardy clauses of the federal and state constitutions. See U.S. Const. amend. V; Wash. Const. art. I, § 9.
The federal and state double jeopardy clauses provide identical protections. State v. Gocken, 127 Wash.2d 95, 107, 896 P.2d 1267 (1995). Both protect against multiple punishments for the same offense. State v. Calle, 125 Wash.2d 769, 776, 888 P.2d 155 (1995). Although the protection itself is constitutional, the Legislature has the power to decide what conduct is criminal and to determine the appropriate punishment. Id. The judicial inquiry thus is limited to determining whether the Legislature intended to authorize multiple punishments. Id. Several tests have emerged to determine the legislative intent. Federal courts use the Blockburger test: "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932); see United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). This test is similar to Washington's "same evidence" test:
In order to be the "same offense" for purposes of double jeopardy the offenses must be the same in law and in fact. If there is an element in each offense which is not included in the other, and proof of one offense would not necessarily also prove the other, the offenses are not constitutionally the same and the double jeopardy clause does not prevent convictions for both offenses.
State v. Vladovic, 99 Wash.2d 413, 423, 662 P.2d 853 (1983); see Calle, 125 Wash.2d at 777, 888 P.2d 155.
There is no question that Mr. Read's murder and assault convictions are the same in fact, because they are based on the same act, directed at the same victim. The precise question here, then, is whether they are the same in law. Under the "same evidence" test, the offenses are the same in law if proof of one offense would necessarily also prove the other. Obviously, proof of first degree assault does not necessarily prove second degree murder, because a person may assault another person without actually causing death.
However, second degree intentional murder requires proof of intent to cause death and actual death. RCW 9A.32.050(1)(a). First degree assault requires proof of intent to inflict great bodily harm and assault "with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." RCW 9A.36.011(1)(a). A person who intends to cause death also must intend to inflict great bodily harm; and a person who (with intent) causes a person's death also assaults that person by a means likely to produce death. See State v. Springfield, 28 Wash.App. 446, 624 P.2d 208 (because robbery conviction required proof of infliction of bodily injury, there was no additional element necessary to prove assault), review denied, 95 Wash.2d 1020 (1981); State v. Cunningham, 23 Wash.App. 826, 860, 598 P.2d 756 (1979) ("State was required to *906 prove, as a preliminary matter, that defendants beat [the victim] (assault) in order to prove that they beat him to death (manslaughter)"), rev'd on other grounds, 93 Wash.2d 823, 613 P.2d 1139 (1980); State v. Bresolin, 13 Wash.App. 386, 394, 534 P.2d 1394 (1975) (acts of force necessary to commit robbery were same as acts of force alleged in count charging second degree assault), review denied, 86 Wash.2d 1011 (1976). Therefore, proof of second degree intentional murder necessarily also proves first degree assault. The offenses are the same in law under the "same evidence" test.[6]
The Blockburger and "same evidence" tests are not always dispositive. See Calle, 125 Wash.2d at 778, 780, 888 P.2d 155. The rules are not controlling where there is a "clear indication of contrary legislative intent." Id. at 778, 888 P.2d 155. "Washington courts have on occasion found a violation of double jeopardy despite a determination that the offenses at issue clearly involved different legal elements." State v. Schwab, 98 Wash.App. 179, 184-85, 988 P.2d 1045 (1999); see State v. Johnson, 92 Wash.2d 671, 679-80, 600 P.2d 1249 (1979), cert. dismissed, 446 U.S. 948, 100 S.Ct. 2179, 64 L.Ed.2d 819 (1980), overruled on other grounds by State v. Sweet, 138 Wash.2d 466, 980 P.2d 1223 (1999); State v. Birgen, 33 Wash.App. 1, 14, 651 P.2d 240 (1982), review denied, 98 Wash.2d 1013 (1983); State v. Potter, 31 Wash.App. 883, 887-88, 645 P.2d 60 (1982). In Calle, for example, the court examined the rape and incest statutes, determining they serve different purposes. Calle, 125 Wash.2d at 780, 888 P.2d 155. Here, by contrast, the second degree murder and first degree assault statutes both are directed at assaultive conduct; the essential difference between them is the grievousness of the harm caused by the conduct. When the harm is the same for both offenses, as in this case, it is inconceivable the Legislature intended the conduct to be a violation of both offenses.
Finally, the State contends the trial court effectively avoided the double jeopardy problem by imposing concurrent sentences for the two crimes and by essentially treating the two crimes as the "same criminal conduct."[7]See RCW 9.94A.400(1)(a). However, double jeopardy is implicated regardless of whether sentences are ordered to be served concurrently. Calle, 125 Wash.2d at 774-75, 888 P.2d 155 (citing Ball v. United States, 470 U.S. 856, 864-65, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985)); see State v. Adel, 136 Wash.2d 629, 632, 965 P.2d 1072 (1998).
In light of Ball, this court now must take into account the punitive aspects of multiple convictions, regardless of the type of sentence imposed, when reviewing such convictions in light of the Fifth Amendment's double jeopardy clause. Although the passage of the Sentencing Reform Act of 1981 eliminates any need to consider the effect of multiple convictions on parole decisions, the stigma and impeachment value of multiple convictions remain.... We hereby reject the concurrent sentence rule and hold that double jeopardy may be implicated when multiple convictions arise out of the same act, even if concurrent sentences have been imposed.
Calle, 125 Wash.2d at 774-75, 888 P.2d 155.
Mr. Read's convictions for second degree murder and first degree assault violate the double jeopardy clauses despite the concurrent sentences.
We affirm the convictions for second degree murder and unlawful possession of a firearm. We vacate the conviction for first degree assault and remand for resentencing.
KURTZ, C.J., and SWEENEY, J., concur.
NOTES
[1] Each of these terms was the top of the standard range for each offense. The sentences for the murder and assault included 60-month firearm enhancements.
[2] Anticipating an argument by the State that he failed to preserve the issue by objecting to the improper lay opinion testimony at trial, Mr. Read also contends trial counsel was unconstitutionally ineffective. However, the State concedes Mr. Read's trial counsel did object. We thus address the issue on its merits.
[3] The court's findings are essentially summaries of the witnesses' testimony. Strangely, some of these findings relate to witnesses whose testimony Mr. Read's brief does not quote or otherwise address in any way. At any rate, in many instances, the court's findings merely reflect the witnesses' own perceptions of the events and are not their opinions. For example, the findings state that one witness testified "she didn't feel threatened by anything that was happening and no one was making any threats." Another witness" indicated that Mr. Read was never threatened." Another witness testified "that there were no threats made toward him." Still another witness testified Mr. Larson "did not rush Mr. Read, he had no weapons, and did not threaten him."
[4] The underlying felony alleged for the felony murder alternative was second degree assault under RCW 9A.36.021(1)(a) or (c).
[5] The court's conclusions include the following confusing sentence: "The evidence in this case indicates that the elements have been met and that Mr. Read did shoot Mr. Larson and that Mr. Larson was not a participant, that Mr. Larson was shot in the chest with a pistol and with the intent beyond a reasonable doubt to inflict great bodily harm upon Mr. Larson, and that the shot was fired in commission of a crime, and that the crime being Assault in the First Degree, and that while this crime was committed, the crime of Assault in the First Degree, Mr. Read was armed with a deadly weapon, that being a firearm." (Emphasis added.) The italicized portion of this sentence suggests the court alternatively found Mr. Read guilty of second degree murder under the felony murder provision, RCW 9A.32.050(1)(b). If this is so, State v. McJimpson, 79 Wash.App. 164, 901 P.2d 354 (1995), review denied, 129 Wash.2d 1013, 917 P.2d 576 (1996) would apply. In that case, the court held the crimes of second degree felony murder and second degree assault are the same in law, but the convictions in that case did not constitute double jeopardy because they involved different victims and thus were not the same in fact. McJimpson, 79 Wash.App. at 169, 901 P.2d 354. Here, Mr. Larson was the victim in both convictions, and the crimes are the same both in fact and in law. If the conviction was for second degree felony murder, the double jeopardy clauses would preclude the separate conviction for assault.
[6] The result is the same under the Blockburger test because proof of first degree assault does not require proof beyond the elements of second degree intentional murder. Thus, each offense does not require proof of a fact that the other does not.
[7] The sentencing court did not expressly find that the two crimes were the "same criminal conduct." If it had done so, each crime would not be treated as criminal history in determining the criminal history for the other. RCW 9.94A.400(1)(a). We decline the State's invitation to calculate the offender score ourselves and thus require the trial court to complete the appropriate calculation on remand.