[No. 47309-3-I. Division One. August 5, 2002.]

THE STATE OF WASHINGTON, *Respondent*, v. MARVIN LEE VERMILLION, *Appellant*.

848

*Jason B. Saunders* (of *Washington Appellate Project*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Heather M. Jensen, Deputy*, for respondent.

KENNEDY, J. — Marvin Lee Vermillion was convicted of first-degree robbery and threats to bomb property. Beginning six days before jury selection, Mr. Vermillion repeatedly and unequivocally requested to represent himself. The trial court denied his requests on the improper basis that his appointed counsel was better educated and versed in the law and thus would better serve his interests. However, assertion of the right to self-representation does not require a showing of technical knowledge. If a person is competent to stand trial, he is competent to represent himself. Mr. Vermillion did not request that the trial be continued, and he was courteous and respectful to the court; thus, there was no indication that his purpose was to delay the trial or to obstruct the orderly administration of justice. We reverse Mr. Vermillion's convictions and remand for a new trial because the trial court failed to uphold Mr. Vermillion's constitutional right to self-representation.

Even though Mr. Vermillion is charged with having committed the robbery by displaying and threatening to detonate what appeared to be a bomb, the State may retry him for both crimes, and if he is convicted he may be punished for both crimes without violation of his constitutional protection against double jeopardy. Also, the trial court properly ruled, at the pretrial CrR 3.6 hearing, that a *Frye*[1] hearing

---

[1] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

was not necessary to prove the reliability of the confidential tracking device by which police located Mr. Vermillion after the robbery, and properly admitted the evidence obtained by use of the tracking device for the jury's consideration. Finally, police had a sufficient basis to stop and frisk Mr. Vermillion. Accordingly, although we reverse and remand for a new trial, we affirm the CrR 3.6 rulings that were made for the first trial.

## FACTS

On July 2, 1998, near the end of the business day, a white male in his 50s, with gray hair and wearing light-colored clothing and gloves, robbed a downtown Seattle bank located on 4th Avenue between Pike and Pine Streets. The robber, who was carrying a package, handed a note to the teller indicating that the package contained a bomb and that he would detonate the bomb if the teller told anybody that a robbery was in progress, or if anyone followed him from the bank. The teller gave the robber a bag containing money, a confidential tracking device, and bait money. The robber then left the bank with the bag, leaving the package containing the alleged bomb at the teller's window. The teller activated the tracking device and promptly called the police, giving them a physical description of the robber. Within moments, several officers converged on the area, some of them in patrol cars that were equipped to locate the tracking device.

The tracking device broadcast a radio signal that led police to Mr. Vermillion, who fit the physical description of the robber except that he was wearing dark clothing and was not wearing gloves. Three officers stopped Mr. Vermillion near the crosswalk at 4th and Pine. One of the officers patted Mr. Vermillion down for weapons and discovered a bag tucked into his waistband containing several thousand dollars, the tracking device, which was still operating, and the bait money. Mr. Vermillion was placed under arrest and his pockets were searched. The note used in the robbery was found in one of his pockets.

The Seattle Police Explosives Squad evacuated the bank building, cordoned off the block surrounding the building, and sent a robot into the bank. The robot moved the package to the floor and opened it. Cameras showed the package to contain a bundle of rolled up paper. A member of the bomb squad, wearing a bomb suit, entered the bank to determine whether a bomb was hidden in the bundle. There was no bomb.

The State charged Mr. Vermillion, by amended information, with one count of robbery in the first degree and one count of threats to bomb or injure property. Mr. Vermillion pleaded not guilty.

On five occasions before and immediately after commencement of the trial, Mr. Vermillion requested to represent himself. The court denied each request.

A CrR 3.6 hearing was held and the court admitted the evidence obtained by the confidential tracking device, denying a defense request for a *Frye* hearing before admitting the evidence, and finding that the device was in proper working condition when police utilized it to locate Mr. Vermillion.

After the jury found Mr. Vermillion guilty as charged, he moved for a new trial on the ground that the court improperly denied his requests to represent himself. Defense counsel moved to withdraw before sentencing and for the appointment of substitute counsel. The court denied both motions. Mr. Vermillion was sentenced to standard-range sentences on both counts.

He timely filed a notice of appeal.

ANALYSIS

Right to Self-Representation

The State and Federal Constitutions guarantee a criminal defendant the right to self-representation. U.S. CONST. amends. VI and XIV; WASH. CONST. art. I, § 22. This right is afforded a defendant despite the fact that exercising

the right will almost surely result in detriment to both the defendant and the administration of justice. *State v. Fritz*, 21 Wn. App. 354, 359, 585 P.2d 173 (1978). A defendant need not demonstrate technical knowledge of the law and the rules of evidence. *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). The right to self-representation is either respected or denied; its deprivation cannot be harmless. *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984).

█ The right is not absolute, however. *In re Pers. Restraint of Richardson*, 100 Wn.2d 669, 674, 675 P.2d 209 (1983). For example, the court bears no affirmative duty to inform a defendant that he has the right; the defendant must personally ask to exercise the right. *State v. Garcia*, 92 Wn.2d 647, 654, 600 P.2d 1010 (1979). Once the issue is raised, however, the trial court should assume responsibility for assuring that the defendant's decision is made with at least minimal knowledge of what the task entails, preferably through a colloquy on the record assuring that the defendant understands the risks of self-representation. *City of Bellevue v. Acrey*, 103 Wn.2d 203, 211, 691 P.2d 957 (1984). At a minimum, a defendant should be apprised of the seriousness of the charge, the maximum potential penalty involved, and the existence of technical, procedural rules governing the presentation of the accused's defense. *Id.*

█ In order to exercise the right, a defendant's request must be unequivocal, knowingly and intelligently made, and must be timely. *State v. Breedlove*, 79 Wn. App. 101, 106, 900 P.2d 586 (1995). The right may not be exercised for the purpose of delaying the trial or obstructing justice. *Id.* Even when a request is unequivocal, a defendant may still waive the right of self-representation by subsequent words or conduct. *State v. Luvene*, 127 Wn.2d 690, 699, 903 P.2d 960 (1995). Courts should indulge every reasonable presumption against finding that a defendant has waived the right to counsel. *State v. Chavis*, 31 Wn. App. 784, 789, 644 P.2d 1202 (1982).

Mr. Vermillion asserts that he repeatedly, consistently, and unequivocally asserted his right to represent himself, and that he did so knowingly, intelligently, and in a timely fashion. The record bears this out. He sought to assert his right on five separate occasions, the first time at an omnibus hearing held on September 30, 1998, before Judge Janice Niemi. At the hearing, his counsel stated, "In addition, Mr. Vermillion would like to make a motion to go pro se today and I don't know when the Court wants to hear that." 3 Report of Proceedings at 3. Judge Niemi declined to address the motion at that hearing.

At a pretrial hearing held on the following day, October 1, 1998, Mr. Vermillion renewed the request before Judge Marsha J. Pechman, who had convened court for the purpose of hearing a motion to exclude witnesses. Mr. Vermillion moved to "discharge" his appointed counsel and to "go forward pro se." 4 Report of Proceedings at 3. He explained to the court: "I raised this with Judge Niemi yesterday, and she, for whatever reason, didn't want to deal with it at that time." *Id.* Mr. Vermillion then stated that he "would prefer to represent" himself because he felt inadequately informed of the charges against him, he wanted to see a copy of the police report, and he wanted to pursue an issue that his trial counsel would not pursue, that being his claim that the police seized $5,000 from his person at the time of his arrest but had reported seizing only $862. *Id.* at 4-5. In response to questions from Judge Pechman, Mr. Vermillion stated that he had taken a couple of years of college, had studied some law, and was prepared to represent himself, examine witnesses, and to be held to the same standard as a lawyer. However, he admitted to having done "very little preparation" for trial. In an effort to satisfy Mr. Vermillion's concerns, Judge Pechman allowed him to see the police reports, with some of the information redacted. Moreover, the deputy prosecutor informed Mr. Vermillion, on the record, of the charges against him and the potential penalty for each charge. The court then denied Mr. Vermillion's motion to represent himself, stating:

> And sir, I believe it's really in your best interests to be able to have counsel. These are serious charges, and you haven't convinced me that you would be prepared to even meet the allegations or know how to proceed in a courtroom, given the serious nature of these charges. And I just—I will enter an order that basically allows you to get copies of the reports, although some information will be removed. . . .

*Id.* at 10-11.

At the next pretrial hearing, held on October 5, 1998, before Judge Carol A. Schapira, Mr. Vermillion immediately repeated his request to represent himself. He explained in further detail that he had some experience in law, including filing "several PRPs[2] while at Walla Walla." Mr. Vermillion insisted that "under the state and . . . federal constitutions I have a right to defend myself." 5 Report of Proceedings at 5. Although Judge Schapira did not disagree that Mr. Vermillion had a right to represent himself, she stated, "The only question is whether or not that's going to lead to a fair trial." *Id.* When Mr. Vermillion responded that he did not believe he would get a fair trial with his current representation, Judge Schapira asked, "why do you think you would do a better job?" *Id.* at 6-7. Mr. Vermillion responded, "I'm not saying I would do a better job. I think I would bring up more than what's going to be brought up." *Id.* at 7. Judge Schapira then denied the motion and proceeded with the CrR 3.6 hearing, which had been started but not completed on September 15, 1998.

The following day, shortly before jury selection was scheduled to commence, and with Judge Schapira still presiding, Mr. Vermillion immediately requested, for the fourth time, to represent himself. The following exchange took place:

> THE DEFENDANT: Your honor, once again, I would like to renew my motion to go pro se based on the fact that the State Constitution and the Federal Constitution both give me the right to proceed pro se.

---

[2] Personal Restraint Petitions.

THE COURT: We had a brief counsel yesterday, Mr. Vermillion. My recollection is that you had a high school education, that you haven't, although you had participated in some legal proceedings like the personal restraint petition, that you had never represented yourself.

THE DEFENDANT: Well, that is not entirely true. I did represent myself once before.

THE COURT: In a prior trial?

THE DEFENDANT: Yes

THE COURT: And did you have a good outcome?

THE DEFENDANT: No, I didn't. But I am sure my attorney hasn't had a good outcome in all of her trials. I am sure you know that shouldn't be—if you had an attorney that lost his first case, you would still let him proceed in trials.

THE COURT: Again, the attorneys that come before me have all had to study law, take a bar exam, been tested, and many of them are selected [ ] by an office to work for them. So there's a lot of controls on the people that come before me. Do you have a familiarity with the rules of evidence?

THE DEFENDANT: Somewhat, yes.

6 Report of Proceedings at 4-5. Mr. Vermillion also stated that he "just can't agree with the defense" and never really had a chance to speak with defense counsel. *Id.* at 6-7. When the panel of prospective jurors entered the courtroom, the judge said, "We will continue this later." *Id.* at 8.

Following jury empanelment, Mr. Vermillion requested for the fifth time to proceed pro se:

THE COURT: Again, we have had an opportunity at least briefly to go back over your background in terms of education and experience. The crimes that you are charged with, I am not fully familiar with your criminal conviction background. I do know that there have been some, and certainly robbery in the first degree is an offense which has a very serious penalty. Is that something that you have had an opportunity to discuss with counsel?

THE DEFENDANT: I don't know just where it's at on the range, but I know, yes, it carries quite a bit of time.

THE COURT: I am going to deny your motion. I am certainly happy to make any accommodations that you need in order to ask an additional question or have time to confer with your counsel to make sure that any defense you're interested in asserting is asserted, any questions that you are interested in asking are asked.

*Id.* at 10-11.

 We review a trial court's denial of a request for self-representation for abuse of discretion. *Breedlove,* 79 Wn. App. at 106. Discretion is abused if the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons. *State v. Blackwell,* 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). In this context, a court's discretion lies along a continuum, corresponding to the timeliness of the request:

> (a) if made well before the trial . . . and unaccompanied by a motion for continuance, the right of self-representation exists as a matter of law; (b) if made as the trial . . . is about to commence, or shortly before, the existence of the right depends on the facts of the particular case with a measure of discretion reposing in the trial court in the matter; and (c) if made during the trial . . . , the right to proceed pro se rests largely in the informed discretion of the trial court.

*Fritz,* 21 Wn. App. at 361. "Where a court is put on notice that the defendant wishes to assert his right to self-representation but it nevertheless delays ruling on the motion, the timeliness of the request must be measured from the date of the initial request." *Breedlove,* 79 Wn. App. at 109.

Here, Mr. Vermillion's first request was made on September 30, 1998. A trial "commences," tolling the speedy trial requirements of CrR 3.3, even when the only matter before the court is a motion to exclude witnesses. *State v. Andrews,* 66 Wn. App. 804, 808-10, 832 P.2d 1373 (1992) (trials found to have started when, in the last minutes of the last possible day, for purposes of speeding trial rules, the respective judges heard motions to exclude witnesses). Even if Mr. Vermillion's trial "commenced" on October 1 with the hear-

ing before Judge Pechman, we cannot ignore the fact that jury selection in Mr. Vermillion's trial did not take place until October 6, nearly a week after he made his first request to represent himself. Mr. Vermillion told the court on October 1 that, although he had done little by way of trial preparation, he was prepared to examine witnesses and to be held to the same standards as a lawyer. He did not request that the trial be continued on any of the occasions that he renewed his motion. There is no indication in the record that Mr. Vermillion made his request for the purpose of delaying trial. Nor is there any indication in the record that Mr. Vermillion made the request for the purpose of obstructing the orderly administration of justice. Mr. Vermillion was at all times courteous and respectful to the court. Certainly, the court retained a "measure of discretion" under *Fritz* because the request was made "shortly" before trial. But as the State itself points out, even where a defendant's request is *not* timely, "the court may deny the request if it finds that the defendant sought to exercise his right for the purposes of delay or to gain tactical advantage, or if granting the request would frustrate the orderly administration of justice." Resp't's Br. at 7-8 (citing *Breedlove*, 79 Wn. App. at 106). We conclude that Mr. Vermillion's request *was* timely. Moreover, the court did not find that he made the request for any improper purpose, and the record is devoid of any evidence that would support such a finding.

Mr. Vermillion's request to represent himself was also unequivocal. The State characterizes Mr. Vermillion's request before Judge Pechman as equivocal, in that he may have thought that the only way he could see the police reports was if he were representing himself. But even if we were to agree with this characterization, we must review the record as a whole, and there was nothing equivocal about Mr. Vermillion's three requests made before Judge Schapira.

The record also demonstrates that Mr. Vermillion's requests were made knowingly and intelligently, that is, he

understood the risks of proceeding pro se, the nature and seriousness of the charges, and the fact that he would be held to the standards of a lawyer although he lacked technical expertise and was only "somewhat" familiar with the rules of evidence.

The record reflects that both Judge Pechman and Judge Schapira were trying to serve Mr. Vermillion's best interests by denying his requests for self-representation. Their denials of Mr. Vermillion's motions were based on the belief that self-representation wouldn't be in Mr. Vermillion's "best interest" because he was thought not sufficiently educated in the law to adequately represent himself. However, that is not the test. No showing of technical knowledge is required. *Faretta*, 422 U.S. at 835. If a person is competent to stand trial, that person is competent to represent himself. *Godinez v. Moran*, 509 U.S. 389, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993).

The purpose of asking the defendant about his experience, if any, in representing himself and his familiarity, if any, with the rules of evidence and other aspects of courtroom procedure is not to determine whether he has sufficient technical skill to represent himself. Rather, the purpose is to determine whether he fully understands the risks he faces by waiving the right to be represented by counsel, such as the risk that lack of familiarity with evidentiary rules could result in admission of prosecution evidence that could have been excluded by a proper objection, or exclusion of defense evidence that the defendant would like to present but cannot for some reason based on evidentiary rules of which he has no knowledge. *See State v. Hahn*, 106 Wn. App. 885, 889-90 & n.3, 726 P.2d 25 (1986). A defendant need not himself have the skill and experience of a lawyer in order to competently and intelligently choose self-representation, but the record should establish that " 'he knows what he is doing and his choice is made with eyes open.' " *Id*. at 889 (quoting *Faretta*, 422 U.S. at 835). "[I]t is the responsibility of the trial court to determine a defendant's competency intelligently to waive the services of counsel

and act as his own counsel, . . . [but] any consideration of a defendant's ability to 'exercise the skill and judgment necessary to secure himself a fair trial' was rendered inappropriate by *Faretta.*" *Hahn,* 106 Wn.2d at 890 n.2 (citing *Fritz,* 21 Wn. App. at 360) (other citations omitted).[3]

Again, the right of self-representation is afforded a defendant despite the fact that its exercise will almost surely result in detriment to the defendant, as well as to the administration of justice in the sense that, notwithstanding the fact that pro se litigants are held to the same standard as lawyers, trials with pro se litigants seldom run as smoothly as trials with experienced counsel and may take longer, thus contributing to court congestion. *See Fritz,* 21 Wn. App. at 359.

Because Mr. Vermillion's requests to represent himself were timely, unequivocal, knowing, and intelligent, and because the trial court's rulings denying the requests were based on the untenable ground that he lacked the necessary skill and judgment to secure himself a fair trial, we must reverse and remand for a new trial.

This ruling makes it unnecessary for us to review Mr. Vermillion's claims regarding ineffective assistance of counsel and whether the trial court should have allowed his appointed counsel to withdraw and to appoint new counsel for sentencing. But we will review Mr. Vermillion's remaining claims because they are likely to arise upon retrial.

Double Jeopardy

■ Fear and abhorrence of governmental power to try people twice for the same conduct has deep historical roots. *Bartkus v. Illinois,* 359 U.S. 121, 151, 79 S. Ct. 676, 3 L. Ed. 2d 684 (1959) (Black, J., dissenting). The double jeopardy clause of the United States Constitution provides that no

---

[3] We commend to trial courts the advisory list of questions for examining prospective pro se defendants found in *State v. Christensen,* 40 Wn. App. 290, 295 n.2, 698 P.2d 1069 (1985) and the "textbook examination" of such a defendant found in *Hahn,* 106 Wn.2d at 896 n.9. The trial court's colloquy with the defendant in *Hahn* also illustrates the kind of conversation that should have already taken place between the defendant and his appointed counsel before the defendant asks the trial court to allow self-representation.

person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. Likewise, Washington State's constitution, which is given the same interpretation as the U.S. Supreme Court gives to its federal counterpart, states, "No person shall be compelled in any criminal case to give evidence against himself, or be twice put in jeopardy for the same offense." WASH. CONST. art. I, § 9; *State v. Gocken*, 127 Wn.2d 95, 109, 896 P.2d 1267 (1995).

▇▇▇ Within these constitutional constraints, the legislative branch has the power to define and assign punishment for criminal conduct. *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). Accordingly, appellate review of a double jeopardy claim requires the court to determine whether the legislature intended to authorize multiple punishments for criminal conduct that violates more than one criminal statute. *Id.* (citing *Albernaz v. United States*, 450 U.S. 333, 344, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981)). If the legislature has not expressly stated its intent, the court turns to rules of statutory construction. *Calle*, 125 Wn.2d at 777. One such rule is the *Blockburger* "same evidence" test, which asks whether the offenses are the same in law and fact. *Calle*, 125 Wn.2d at 777-78; *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). Offenses are the same "in fact" when they arise from the same act or transaction. *Calle*, 125 Wn.2d at 777-78. Generally, two convictions are the same "in law" when proof of one offense would also prove the other. *Id.* at 777. Failure under the same evidence test creates a strong presumption in favor of multiple punishments. *Id.* at 780.

Mr. Vermillion concedes that his convictions for both robbery in the first degree[4] and threats to bomb or injure

---

[4] RCW 9A.56.200—**Robbery in the first degree** provides:

(1) A person is guilty of robbery in the first degree if in the commission of a robbery or of immediate flight therefrom, he:

 (a) Is armed with a deadly weapon; or

 (b) Displays what appears to be a firearm or other deadly weapon; or

 (c) Inflicts bodily injury.

property[5] are not the same in law, as each offense requires proof of an element not contained in the other. But he argues that he was nevertheless placed in double jeopardy by being punished for both crimes because first degree robbery requires the display of a deadly weapon or what appears to be a deadly weapon, such as a bomb, in the commission of a robbery; thus, he contends, the threat to bomb the bank was only incidental to and an element of the robbery and the crimes constitute the same transaction and offense—namely, first degree robbery. *See State v. Johnson*, 92 Wn.2d 671, 679-80, 600 P.2d 1249 (1979) (examining convictions for first degree rape, first degree kidnapping, and first degree assault and striking the kidnapping and assault convictions even though the *offenses involve differ-ent legal elements* because the kidnapping and assault were incidental to, and elements of, the first degree rape), *disapproved on other grounds*, *State v. Sweet*, 138 Wn.2d 466, 980 P.2d 1223 (1999). *See also State v. Potter*, 31 Wn. App. 883, 887-88, 645 P.2d 60 (1982) (holding that convic-tions for reckless endangerment and reckless driving vio-lated double jeopardy despite differing legal elements be-cause reckless endangerment through reckless driving always proves reckless driving); *State v. Birgen*, 33 Wn. App. 1, 14, 651 P.2d 240 (1982) (holding that convictions for third degree rape and statutory rape for a single act of sexual intercourse violated double jeopardy, even though the crimes were not the same in law and fact under the *Blockburger* test, because proof of third degree rape com-mitted by someone over 18 against a victim under age 16 always proves statutory rape). Mr. Vermillion also contends that because it was the display and threat to detonate what appeared to be a bomb that raised the degree of robbery in

---

[5] RCW 9.61.160—**Threats to bomb or injure property** provides:

It shall be unlawful for any person to threaten to bomb or otherwise injure any public or private school building, any place of worship or public assembly, any governmental property, or any other building, common carrier, or structure, or any place used for human occupancy; or to communicate or repeat any information concerning such a threatened bombing or injury, knowing such information to be false and with intent to alarm the person or persons to whom the information is communicated or repeated.

this case to that of robbery in the first degree, the offenses merged into the single offense of first-degree robbery. *See State v. Vladovic*, 99 Wn.2d 413, 421, 662 P.2d 853 (1983) (offenses merge where legislature has clearly indicated that in order to prove a particular degree of crime, e.g., first degree rape, the State must prove not only that the defendant committed that crime, e.g., rape, but that the crime was accompanied by an act that is defined as a crime elsewhere in the criminal code, e.g., assault or kidnapping). *See also Calle*, 125 Wn.2d at 775 (there are no nondouble jeopardy reasons for the common law doctrine of merger).

 But even where a crime is elevated to a higher degree by proof of another crime proscribed elsewhere in the criminal code, both convictions will be allowed to stand where the legislative purpose for criminalizing the conduct or the harm associated with each crime is unique, that is, where the statutes in question address two separate evils. *See Johnson*, 92 Wn.2d at 680 (where proof of one degree of crime requires proof of another crime, the "additional conviction cannot be allowed to stand *unless it involves some injury to the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element.*") (emphasis added); *see also Calle*, 125 Wn.2d at 780 (the crimes of rape and incest address two separate evils; a single act of intercourse can violate both statutes).[6]

We conclude that the legislature intended to punish both crimes where a defendant commits first degree robbery by means of displaying and threatening to detonate what appears to be a bomb. The statutes serve different purposes and address separate evils. The robbery statute is designed to discourage the taking of property from the person of another by use or threatened use of force and serves to

---

[6] The converse is also true. Even where the crimes are not the same in fact and law, two convictions may still violate double jeopardy if the behavior resulted in the same harm. *E.g., State v. Read*, 100 Wn. App. 776, 792-93, 998 P.2d 897 (2000) (the harm is the same for an assault that ends in murder); *State v. Valentine*, 108 Wn. App. 24, 29, 29 P.3d 42 (2001) (behavior caused the same harm for purposes of assault and attempted murder).

protect individuals from loss of property and threat of violence to their persons. The threats to bomb statute is designed to deter bomb threats, which inspire fear in many individuals, disrupt their daily activities, require them to evacuate buildings causing great loss of private resources, and require aggressive response by bomb squads causing great expenditure of public resources. Here, the robber not only took several thousand dollars of the bank's money by use or threatened use of force, he also caused the bomb squad to be called out, a downtown building to be evacuated, an entire city block to be cordoned off and, presumably, at least some physical damage to the bank premises in that the robot opened the package by use of a high-powered stream of water. The crimes did not merge, and Mr. Vermillion's right of protection from double jeopardy was not violated. Accordingly, he may be retried for both crimes, and if convicted, punished for both crimes.

Confidential Tracking Device

■ ■ We next hold that the trial court was not required to hold a *Frye* hearing before determining that the evidence obtained by the use of the confidential tracking device would be admitted at trial. First of all, the tracking system does not involve a novel scientific theory. *See State v. Hayden*, 90 Wn. App. 100, 103-04, 950 P.2d 1024 (1998) (if evidence does not involve a novel scientific theory or principle, a *Frye* inquiry is unnecessary). The tracking system employs common technology involving the transmission and reception of radio signals between the tracking device, receiving unit, and transmission towers. *See People v. Cortorreal*, 181 Misc. 2d 314, 317, 695 N.Y.S.2d 244 (1999) (holding that a low-jack tracking system using "nothing more sophisticated than radio communications emitted from a source to a receiver" was based on generally accepted scientific principles and established technology not subject to a *Frye* hearing). Furthermore, use of the system required only objective observation of information relayed from the tracking device to the receiving unit, analogous to other scientific devices that are not subject to *Frye*. *See, e.g., City*

*of Bellevue v. Lightfoot*, 75 Wn. App. 214, 222, 877 P.2d 247 (1994) (affirming that police traffic radar evidence is not subject to a *Frye* analysis); *State v. Noltie*, 57 Wn. App. 21, 29-30, 786 P.2d 332 (1990), *aff'd*, 116 Wn.2d 831, 809 P.2d 190 (1991) (finding that the colposcope is in general use in the medical community and is no more a novel device or scientific process subject to the *Frye* standard than binoculars or a weak microscope).

The record reflects that police witnesses properly authenticated the system by showing that it was working properly at the time police located the device on Mr. Vermillion's person. Detective Gary Nelson testified that the device, when activated, emits a radio signal on a confidential frequency to stationary towers located throughout the greater Seattle area, which in turn relay the signal to the command center, which in turn relays the signal to patrol vehicles that are equipped with mobile units. The mobile units enable officers in those vehicles objectively to locate the device by means of a digital indicator and to determine how close the device is to the vehicle based on the strength of the radio signal and the pitch and volume of an auditory signal. The system had been in use nationally for about nine years, and by the Seattle police for about three and one-half years. Qualified experts testified that the system is regularly checked and the mobile units are regularly calibrated to ensure operational accuracy. If a tracking device is not working properly, it emits no signal at all and, since the system uses a confidential frequency, police will not accidentally track a signal broadcast by something other than the tracking device. Here, the device led officers directly to Mr. Vermillion, who was near the scene of the robbery and who generally fit the robber's description. We affirm the trial court's ruling admitting the evidence without first conducting a *Frye* hearing and its determination that the system was working properly when the device led police to Mr. Vermillion.

Investigatory Stop and Protective Frisk

 The final issue concerns the investigatory stop and frisk of Mr. Vermillion by which the bag containing money, the tracking device, and bait money was found on his person. The general prohibition against warrantless searches and seizures is subject to a few jealously guarded exceptions, one of which is the investigatory *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). We do not need to consider the State's contention that there was a sufficient basis for a *Terry* stop even without the evidence of the tracking device, because that evidence was properly admitted. The cumulative evidence of the tracking device, Mr. Vermillion's proximity to the robbery, and his physical description gave the officers sufficient reasonable suspicion to justify their investigatory stop of Mr. Vermillion. *See State v. White*, 97 Wn.2d 92, 105, 640 P.2d 1061 (1982) (officer may seize an individual if he has reasonable suspicion based on specific and articulable facts that criminal activity is in progress). It was lawful for the officers to frisk Mr. Vermillion for weapons because robbery is a crime of violence that poses a threat to others, including pursuing police. *See* RCW 9A.56.190; *State v. Collins*, 121 Wn.2d 168, 173, 847 P.2d 919 (1993) (officer may conduct a protective frisk for weapons if able to point to specific and articulable facts supporting an objectively reasonable belief that the individual is armed and presently dangerous).

Although we reverse Mr. Vermillion's conviction and remand for a new trial because his right to self-representation was violated, we affirm the trial court's CrR 3.6 rulings admitting the evidence obtained by use of the tracking device and refusing to suppress evidence obtained as the result of the stop and frisk.

COLEMAN and APPELWICK, JJ., concur.

Review denied at 148 Wn.2d 1022 (2003).