159 P.3d 435 (2007)
In re the DETENTION OF J.S.
State of Washington, Respondent,
v.
J.S., Appellant.
No. 34298-7-II.
Court of Appeals of Washington, Division 2.
June 1, 2007.
*437 Susan F. Wilk, Washington Appellate Project, Seattle, WA, for Appellant.
S. Morgan Pate, Office of Attorney General, Carl Berton Paul, Assistant Attorney General, Olympia, WA, for Respondent.
HUNT, J.
¶ 1 JS appeals his involuntary civil commitment under chapter 71.05 RCW. He argues that (1) the trial court unconstitutionally denied his requests for a new attorney and to represent himself at his 90-day involuntary treatment hearing; (2) the State's petition did not provide adequate notice and, thus, violated his procedural due process rights; and (3) the evidence was insufficient to support the trial court's finding that he was "gravely disabled" and to justify committing him for 90 days. These arguments are technically moot because JS has completed his 90-day civil commitment.
¶ 2 Nonetheless, JS's first argument raises recurring issues of public importance that require clarification. Therefore, we address the following issues: (1) What standard applies when a person facing involuntary civil commitment under chapter 71.05 RCW asks to represent himself? (2) To what extent does a recent court determination of a person's incompetence to stand trial bear on that person's competence to waive his right to counsel at an involuntary civil commitment proceeding?
¶ 3 Applying the standard for a criminal defendant's waiver of counsel to a person facing civil commitment under chapter 71.05 RCW, we hold that (1) JS had a constitutional right to represent himself; and (2) although the trial court properly took note of a recent determination of JS's incompetency to stand trial, it erred in failing to make a separate determination of his competence to waive his right to counsel in the civil commitment proceeding. We dismiss JS's remaining two claims on appeal as moot.

FACTS

I. BACKGROUND
¶ 4 JS is a 35 year-old male with a history of physical and emotional trauma. In 1989, he received medical treatment after he was assaulted with a baseball bat. In 1995, he received treatment for stab wounds and for head injuries sustained from being struck with a chair. In 2000, a gunshot wound to his head caused him to lose the use of both legs and one arm.
¶ 5 In 2003, JS went to Harborview's emergency room to receive treatment for voices he was hearing. Thereafter, he spent time at the Western State Hospital for two and one-half months in 2003 and for three and one-half months in 2004.

II. INVOLUNTARY COMMITMENT

A. Finding of Incompetency and Referral for Possible Civil Commitment
¶ 6 On December 14, 2005, the King County Municipal Court found JS incompetent to stand trial in a criminal prosecution, and it ordered him detained for 72 hours at Western State Hospital for evaluation and possible involuntary civil commitment under chapter 71.05 RCW.

B. Filing of Involuntary Civil Commitment Petition
¶ 7 On December 16, Bruce Gage, M.D., and Linda Bowman, PhD, filed a petition in superior court to commit JS involuntarily for 90 days for inpatient mental health treatment. The petition alleged that JS was "gravely disabled" as a result of a mental disorder.

*438 C. JS's Request to Represent Himself at Trial
¶ 8 At the beginning of the December 23 hearing, JS's court-appointed attorney told the court commissioner that JS wanted to dismiss him as counsel. JS immediately corrected his attorney and told the court he wanted to represent himself. The court asked JS, "Did you want to represent yourself?" JS responded, "Yes, I would like to. Yes, I would like to." Report of Proceedings (RP) at 4.
¶ 9 The Court then initiated the following colloquy with JS:
THE COURT: What experience have you had in the courtroom in trying cases?
[JS]: Well, I know the basic rules. This is a nonjurorwell, from my understanding, I couldget heard by
THE COURT: What training have you had in law?
[JS]: What is that again?
THE COURT: What training have you had in courtroom experience?
[JS]: I read a book or two.
THE COURT: You read a book or two. Do you know how to cross-examine witnesses?
[JS]: Yes, I do. A little bit.
THE COURT: When did you last do that?
[JS]: Well, I haven't been in court
THE COURT: You haven't done that.
[JS]:in a long time
THE COURT: Your request is denied, sir.
[JS]: How much experience do I need?
THE COURT: Your request is denied, sir.
[JS]: It's denied. Why is that so?
THE COURT: Because it's denied. I find that you are not able to represent yourself.
RP at 4-5.
¶ 10 When the trial court denied JS's request to represent himself, JS asked the court to document his request and stated he would like the court to appoint him a different attorney. The trial court denied this request as well. JS made no further requests to represent himself.

C. Involuntary Civil Commitment Trial
¶ 11 The same attorney continued to represent JS during the 90-day civil commitment hearing. Nonetheless, JS himself objected to testimony and made comments about the testimony throughout the trial.
¶ 12 Dr. Bowman (1) testified about her qualifications; (2) offered her opinion that JS suffered from a cognitive disorder, with schizophrenia to be ruled out, and an Axis II diagnosis of antisocial personality; (3) provided the court with examples of JS's symptoms that led to her diagnosis, such as his inability to make "rational decisions that are in his best interest," RP at 11; (4) noted that JS "is very much at risk for hurting himself. His [activities of daily living] are so severely compromised that I think that he does certainly constitute a health issue," RP at 11; and (5) testified that JS suffered from mood disturbance, anger, hostility, and susceptibility to becoming easily agitated.
¶ 13 Dr. Bowman expressed particular concern that this was JS's third admission to Western State Hospital in three years: On this most recent occasion, just nine days earlier, JS reeked of stale urine, and he refused to bathe himself. In Dr. Bowman's opinion, if JS left the hospital, he would not take his medications, he would not be able to find housing, and his hygiene would deteriorate to a health-jeopardizing point. Dr. Bowman further explained that it was important for the medical staff to "know exactly what cognitive problems have been caused by this gunshot wound and how we can get him the type of treatment that he needs." RP at 13. The State then rested its case.
¶ 14 JS (1) testified that he did suffer from a cognitive disorder, but that the disorder mainly manifested physically in such ways as eyesight loss; (2) admitted that he had memory problems as well; (3) was adamant that he was able to care for himself, noting that he could dress himself, shower, cook, and ride the bus, and he had a place to stay; and (4) admitted he did not take his medications because they made him feel "lazy."
¶ 15 "Think[ing]" JS could not "make it on [his] own," RP at 27, the trial court ruled that, as a result of his cognitive disorder, JS *439 met the statutory definition of "gravely disabled." The court entered written findings, noting that JS
easily becomes agitated, would not interview last evening. Has lived a hard life suffering several serious injuries, including gunshot wound to the head. Was at Harborview for cognitive disorderhearing voices. Is not cooperative. Is angry and hostile. He refuses to take his medications. Diagnosis: cognitive disorder NOS, R/O schizophrenia, anti social personality.
Clerk's Papers at 12-13.
¶ 16 The trial court involuntarily committed JS to Western State Hospital for an initial period of 90 days. At the end of this 90-day period, the State dismissed its petition for 180 days commitment and JS was released from the hospital.

III. APPEAL
¶ 17 JS appeals his 90-day involuntary commitment, even though his arguments are now moot. At the December 4 oral argument in this appeal, we requested supplemental briefing from the parties on the issue of what standards and procedure should apply when a person seeks to waive counsel at an involuntary commitment hearing under chapter 71.05 RCW. The State and JS met and agreed that the procedure should include a two-part test where the trial court determines: (1) whether the person is competent to waive counsel; and (2) if the person is competent, whether the waiver is knowing, voluntary and intelligent.
¶ 18 The parties disagree, however, on two additional points. First, the parties dispute whether a presumption of incompetency should follow a criminal court's finding of incompetency under chapter 10.77 RCW, especially where, as here, the independent judicial incompetency finding is recent. Second, the parties disagree on the proper colloquy in which the trial court should engage to determine whether the person to be committed is waiving the right to counsel knowingly, intelligently, and voluntarily.

ANALYSIS

I. MOOTNESS
¶ 19 We first address the State's request that we dismiss JS's appeal because the issues he raises are moot: The State is no longer detaining JS under the 90-day involuntary commitment that he challenges here. Agreeing that the appeal is moot, we further agree with the State that we should refrain from addressing JS's second and third issueswhether the state's petition provided adequate notice and whether the evidence was sufficient to commit him involuntarily for 90 days; these issues do not meet the criteria for addressing a moot claim.[1]
¶ 20 But we deny the State's request to disregard JS's third issue-his right to self representation. Because this issue involves a matter of continuing and substantial public interest, we address it.

A. Standard of Review
¶ 21 An issue is moot when a court can no longer provide meaningful relief. See Sorenson v. City of Bellingham, 80 Wash.2d 547, 558, 496 P.2d 512 (1972). Nonetheless, we may review a moot case that involves "matters of continuing and substantial public interest." In the Matter of the Detention of McLaughlin, 100 Wash.2d 832, 838, 676 P.2d 444 (1984). When determining whether to review a moot appeal, we consider the following criteria:
(1) the public or private nature of the question presented; (2) the desirability of an authoritative determination which will provide future guidance to public officers; and (3) the likelihood that the question will recur.
McLaughlin, 100 Wash.2d at 838, 676 P.2d 444 (citing In the Detention of Cross, 99 Wash.2d 373, 377, 662 P.2d 828 (1983)).

B. Applicability of Mootness Test to JS's Issue
¶ 22 Washington courts have previously held that the need to clarify the civil *440 commitment statutory scheme is a matter of continuing and substantial public interest. McLaughlin, 100 Wash.2d at 838, 676 P.2d 444; Cross, 99 Wash.2d at 377, 662 P.2d 828. JS's appeal raises a significant constitutional issue that similarly needs clarification. A patient's claimed right to self-representation at a civil commitment hearing is an issue of first impression in Washington.[2]See McLaughlin, 100 Wash.2d at 838, 676 P.2d 444; Cross, 99 Wash.2d at 377-78, 662 P.2d 828.

II. SELF-REPRESENTATION
¶ 23 JS contends that the trial court's failure to allow him to represent himself at his involuntary civil commitment hearing violated his rights under the Washington Constitution. This is an issue of first impression. Thus far, Washington courts have addressed the right to self-representation in only the criminal context.

A. Existence of Right to Self-Representation
¶ 24 Article I, section 22 of our Washington Constitution guarantees that "in criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel," which includes "the constitutional right to represent himself." State v. Silva, 107 Wash.App. 605, 618, 27 P.3d 663 (2001). This right is absolute; "its deprivation cannot be harmless." State v. Vermillion, 112 Wash.App. 844, 851, 51 P.3d 188 (2002) (citing McKaskle v. Wiggins, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984)).
¶ 25 No Washington case has explicitly extended this constitutional right of self representation to persons involuntarily detained for civil commitment. Nonetheless, we note the following language of RCW 71.05.360(11), which requires the court to appoint counsel if the individual "so elects":
Every person involuntarily detained shall immediately be informed of his or her right to a hearing to review the legality of his or her detention and of his or her right to counsel, by the professional person in charge of the facility providing evaluation and treatment, or his or her designee, and, when appropriate, by the court. If the person so elects, the court shall immediately appoint an attorney to assist him or her.

RCW 71.05.360(11) (emphasis added). This statutory language implies the corresponding right of such involuntary detainee to proceed without counsel.
¶ 26 The State concedes that a person's constitutional right to represent himself in the criminal context applies to the civil commitment process as well. In re Detention of Turay, 139 Wash.2d 379, 395-96, 986 P.2d 790 (1999) (right to self-representation at sexual violent predator civil commitment). Agreeing that the right of self representation should apply in involuntary civil commitment proceedings under chapter 71.05 RCW, we so hold.

B. Unequivocal Assertion of Right to Self-Representation

1. Standard of review
¶ 27 In a criminal proceeding, "[c]ourts should indulge every reasonable presumption against finding that a defendant has waived the right to counsel." Vermillion, 112 Wash.App. at 851, 51 P.3d 188 (citing State v. Chavis, 31 Wash.App. 784, 789, 644 P.2d 1202 (1982)). Thus, a criminal defendant must make an unequivocal, intelligent, and knowing request in order to exercise his right to self-representation. State v. Breedlove, 79 Wash.App. 101, 106, 900 P.2d 586 (1995). In the criminal context, we review a trial court's denial of an accused's request for self-representation for abuse of discretion, Breedlove, 79 Wash.App. at 106, 900 P.2d 586, in relation to the timeliness of the request. State v. Fritz, 21 Wash.App. 354, 361, 585 P.2d 173 (1978). We see no reason not to apply the same abuse of discretion standard here.

*441 2. JS's unequivocal request
¶ 28 The State argues that JS's request to represent himself was not unequivocal and, thus, it did not trigger the trial court's duty to engage him in a colloquy to determine his competence to waive counsel.[3] We disagree.
¶ 29 When JS's lawyer initially told the trial court that JS wanted a new attorney, JS immediately corrected his lawyer and stated he wanted to represent himself, making sure that the trial court documented his request on the record. The trial court treated JS's request to represent himself as unequivocal and engaged him in a brief colloquy to explore JS's ability to represent himself. Only after the trial court denied JS's request to represent himself did JS ask the court to appoint him a new attorney.
¶ 30 An unequivocal request is one that is clear and lacks ambiguity. BLACK'S LAW DICTIONARY 1563 (8th ed.2004). Here, it was JS's counsel who initially informed the trial court that JS wished to have another lawyer appointed. Immediately clarifying counsel's statement, JS himself told the court that he wished to represent himself. When the trial court asked JS, "Did you want to represent yourself?" JS unequivocally responded, "Yes, I would like to. Yes, I would like to." RP at 4. Furthermore, when the trial court denied his self-representation request, JS ensured that his request was documented in the record.[4]
¶ 31 On this record, we find no ambiguity in JS's request to represent himself. We hold, therefore, that JS's request to represent himself was unequivocal, thus, triggering the trial court's duty to determine his competency to waive his right to counsel.

C. Determination of Competency

1. Two-step procedure
¶ 32 Washington courts have not addressed what standards the trial court should apply to determine the competency of a person wanting to exercise his right to self-representation in an involuntary civil commitment hearing. Thus, we look for guidance to other states, such as Illinois and Wisconsin, which also recognize a constitutional right to self-representation at civil commitment hearings and whose courts have addressed applicable competency standards. People v. Dennis D., 303 Ill.App.3d 442, 236 Ill.Dec. 540, 707 N.E.2d 667 (1999)[5]; In the Matter of the Condition of S.Y., 156 Wis.2d 317, 457 N.W.2d 326 (Ct.App.1990). See also North Dakota's statutory provision.[6]
¶ 33 The Illinois Court of Appeals premises its Dennis analysis on Illinois's statutory scheme for civil commitment, which presumes a defendant to be legally competent at the outset of the civil commitment hearing and requires a separate determination of incompetency to overcome this presumption.[7]Dennis, 236 Ill.Dec. 540, 707 N.E.2d *442 at 670. Against the backdrop of Dennis's statutorily presumed competency, the Illinois appellate court reasoned that the trial court must inquire into the defendant's capacity and understanding before denying this constitutional right to self-representation based on specific facts in the record. Id. at 672; see also S.Y., 457 N.W.2d at 329-30. The court held that the trial court unconstitutionally deprived Dennis of his right to self-representation because (1) the trial court neither inquired into his mental capacity nor initiated a colloquy to determine if he fully understood his request to waive counsel; and (2) therefore, nothing on the record supported the court's denial of Dennis's request to represent himself. 236 Ill. Dec. 540, 707 N.E.2d at 672.
¶ 34 Washington's civil commitment statute does not similarly expressly presume the competency of a person subject to a civil commitment hearing. Instead, Washington's statute achieves a comparable result by prohibiting a presumption of incompetency based on "an evaluation or voluntary or involuntary treatment for a mental disorder,"[8] subject to the following exception: "Competency shall not be determined or withdrawn except under the provisions of chapter [10.77][[9]] or 11.88 RCW.[[10]]" RCW 71.05.360(1)(b). This Washington statute thus implies the need for a separate competency determination, mirroring the express requirement in the analogous Illinois statute.
¶ 35 Nor does RCW 71.05.360(1)(b) prescribe how the trial court should make such a competency determination in the involuntary civil commitment context. Therefore, we adopt the two-part procedure that both parties advocate in their supplemental briefs. Accordingly, we hold that, if the person subject to a involuntary civil commitment under chapter 71.05 RCW unequivocally asks to represent himself, the trial court should follow this two-step procedure: First, the trial court must determine if the person is competent to decide whether to waive his right to counsel. Second, if the trial court finds the person competent, then it must determine whether the person is waiving counsel knowingly, voluntarily, and intelligently. The trial court did not reach this second step here; nor do we. Thus, we address only the first step.

2. Guidelines for determining competency
¶ 36 RCW 10.77.020(1) provides that a person may waive his right to counsel in a civil commitment proceeding only "if a court makes a specific finding that he or she is or was competent to so waive." This statute also provides the following guidance to a trial court determining whether the person is competent to waive counsel:
[T]he court shall be guided but not limited by the following standards: Whether the person attempting to waive the assistance of counsel, does so understanding:
(a) The nature of the charges;
(b) The statutory offense included within them;

*443 (c) The range of allowable punishments thereunder;
(d) Possible defenses to the charges and circumstances in mitigation thereof; and
(e) All other facts essential to a broad understanding of the whole matter.
RCW 10.77.020(1).
¶ 37 When JS asked to represent himself, the trial court engaged him in a brief colloquy about his previous trial experience, such as whether he knew how to cross examine a witness. The trial court did not inquire about whether JS understood the nature of the proceedings or any of the other factors in the RCW 10.77.020(1) guidelines before it denied JS's request, stating, "I find that you are not able to represent yourself," without, articulating its reasons.[11]
¶ 38 Because there is no relief that we can provide JS at this time and because neither the parties nor the trial court below litigated or resolved the extent to which the trial court should have inquired of JS before determining his incompetency to waive his right to counsel, we do not further address this issue.[12] Nor do we further address the issue of whether the trial court denied JS his constitutional right to represent himself.

III. CONCLUSION
¶ 39 Applying the standard for a criminal defendant's waiver of counsel to a person facing civil commitment under chapter 71.05 RCW, we hold that (1) JS had a constitutional right to represent himself; and (2) although the trial court properly took note of a recent determination of JS's incompetency to stand trial, it erred in failing to make a separate determination of his competence to waive his right to counsel in the civil commitment proceeding. But because JS has completed the 90-day civil commitment that he challenges in this appeal, there is no relief that we can provide him on this claim. We dismiss JS's remaining claims as moot.
We concur: HOUGHTON, C.J., and ARMSTRONG, J.
NOTES
[1] The standard of proof for an involuntary commitment is well settled. See In the Matter of the Detention of LaBelle, 107 Wash.2d 196, 728 P.2d 138 (1986). Moreover, other cases have provided authoritative guidance on this issue, and it is not likely that this specific set of facts will reoccur. Thus, we grant the State's request to dismiss these claims on appeal.
[2] The State argues that the constitutional right to self-representation in involuntary commitments is identical to that in the criminal context and, thus, the issue is well settled. We disagree that the issue is well settled. We do agree, however, that we should apply the criminal standard for self-representation to involuntary civil commitments.
[3] The State also seems to imply that JS had a duty to repeat his request for self representation continually after the trial court denied his motion and noted his objection to the trial court's denial on the record. We see no reason to apply a more stringent standard here than we apply to attorneys, who, in order to preserve error, generally need not continue to make objections after a trial court's definitive ruling.
[4] Only after the trial court informed JS that his request was noted in the record did JS himself request a new attorney.
[5] In Dennis, the Illinois Court of Appeals addressed facts similar to those here. The State sought to commit Dennis because he had a schizophrenic disorder. 236 Ill.Dec. 540, 707 N.E.2d at 669. He informed the trial court that he did not trust his attorney and, thus, he wished to proceed without representation. 236 Ill.Dec. 540, 707 N.E.2d at 668-69. The trial court neither inquired into Dennis's mental capacity nor initiated a colloquy to determine if he fully understood the ramifications of his request. Instead, the court simply informed Dennis that his request was denied. Id. Dennis repeated his request, and when the court denied it again, he became agitated and the court removed him from the trial. Id.
[6] See In the Interest of C.S., 713 N.W.2d 542, 547 (N.D.2006), which the State cites in its supplemental brief.
[7] 405 Ill. Comp. Stat. 5/12-11 (1987) provides:

No recipient of services shall be presumed legally disabled, nor shall such person be held legally disabled except as determined by a court. Such determination shall be separate from a judicial proceeding held to determine whether a person is subject to involuntary admission or meets the standard for judicial admission.
For comparison, see North Dakota's statute, which is more explicit in its presumption of competency, even where there has been a prior adjudication of legal incompetency:
1. No determination that a person requires treatment, no court order authorizing hospitalization or alternative treatment, nor any form of admission to a hospital gives rise to a presumption of, constitutes a finding of, or operates as an adjudication of legal incompetence, or of the inability to give or withhold consent.
2. No order of commitment under any previous statute of this state, in the absence of a concomitant appointment of a guardian, constitutes a finding of or operates as an adjudication of legal incompetence, or of the inability to give or withhold consent.
N.D. Cent.Code, § 25-03.1-33 (2006).
[8] The trial court did not find JS incompetent based on any such previous mental health treatment or evaluation. Rather, it appears to have found JS incompetent based on its brief colloquy with JS and the previous criminal trial court's incompetency finding under RCW 10.77.090.
[9] Both parties acknowledge that the actual cite to "RCW 10.97" (criminal records privacy act) contains a scrivener's error in the statute's chapter number: The cite should be to RCW 10.77, which establishes procedures for the "Criminally Insane." More specifically, RCW 10.77.090 provides procedures for determining competency in criminal proceedings.
[10] RCW 11.88.045(3) entitles an alleged incapacitated person, for whom a guardianship is sought, to a jury trial at which his or her incapacity must be proved by "clear, cogent, and convincing evidence."
[11] We again note that only 11 days earlier, another court, in separate criminal proceeding, had expressly determined that (1) JS was not capable of understanding the nature of the criminal charges against him, (2) JS was incompetent to assist in his own defense, and (3) his competence was unlikely to be restored by inpatient or outpatient treatment within the time limits of RCW 10.77.090(1)(d)(i). Based on this judicial finding of JS's incompetence, the criminal trial court had referred JS to Western State Hospital for an involuntary commitment evaluation under RCW 10.77.090, which apparently triggered the State's filing of the instant petition to commit JS involuntarily for 90 days.

We further note that at the involuntary commitment hearing's conclusion, the trial court found JS "gravely disabled" and entered the following written findings:
[JS] easily becomes agitated, would not interview last evening. Has lived a hard life suffering several serious injuries, including gunshot wound to the head. Was at Harborview for cognitive disorder-hearing voices. Is not cooperative. Is angry and hostile. He refuses to take his medications.
Diagnosis: cognitive disorder NOS, R/O schizophrenia, anti social personality.
Clerk's Papers at 12-13.
In so noting, however, we do not intend to suggest that either the previous criminal court's finding of incompetence or this trial court's ultimate finding of grave disability can suffice for an independent finding of incompetency to waive counsel.
[12] We also leave for another day resolution of what type of colloquy the trial court must conduct, once the court determines that the person to be committed is competent to waive counsel, in order to ensure the validity of such waiver. Therefore, we do not address (1) the disagreement between the State and JS over whether a person seeking to represent himself must demonstrate "legal skills" in order to proceed pro se at a civil commitment hearing; or (2) whether Washington should adopt the Illinois procedure set forth in Dennis or, the procedure Washington uses in the criminal context and require that, in determining waiver of counsel in the civil commitment context, the trial court must engage in a meaningful colloquy with the person to be committed to ensure the validity of his waiver. See, for example, our Supreme Court's description of a meaningful colloquy in the criminal context in Washington: State v. Woods, 143 Wash.2d 561, 587-88, 23 P.3d 1046 (2001) (once a defendant unequivocally waives his right to counsel, the trial court should inform the defendant of the charges against him, warn him of the possible penalties and consequences, and advise him of the disadvantages of self-representation), cert. denied, 534 U.S. 964, 122 S.Ct. 374, 151 L.Ed.2d 285 (2001).