2014 JUN 16 AM 8:44


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Detention of P.C. | ) | No. 70256-4-I |
| | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | FILED: June 16, 2014 |
| | ) | |

VERELLEN, A.C.J. — P.C. seeks reversal of a 14-day involuntary treatment order. He contends that the trial court erred in summarily denying his request to represent himself in the proceedings and challenges the sufficiency of the evidence supporting the court's finding that because of a mental disorder, he presented a likelihood of serious harm to property of others. Finding no error, we affirm.

## FACTS

Alex had been sharing an apartment with his younger brother P.C. for a couple of months in March 2013, when he began to notice changes in P.C.'s behavior. P.C. was sleeping very little and exhibiting abnormally energetic and erratic behavior.

Around the middle of the month, Alex received a call from P.C., who was on a trip to Oregon. P.C. acknowledged that things did not seem "quite right."[1] He described "seeing things in the corner of his eye," mentioned "water turning to wine," and admitted that he might need "help."[2] P.C. later drove back to Seattle in the

---

[1] Report of Proceedings (RP) (Apr. 2, 2013) at 9.

[2] Id.

1

middle of the night, without his wallet or cell phone. Back in Seattle, P.C. told Alex that while in Oregon he had "found a cure for depression."[3]

One night shortly after, P.C. stayed up after Alex went to bed. During the night, Alex continually woke up to sounds of banging. Alex checked on P.C. at some point and found him banging pocket knives on a table. P.C. was convinced that the Central Intelligence Agency (CIA) was controlling his playlist and monitoring him. Alex checked on P.C. again and found that he had smashed a chair. P.C. then threw some items off the fifth floor balcony of the apartment and left the apartment wearing a shirt and boxer shorts, and no shoes. P.C. informed Alex that he was going to confront the CIA, which he believed was conducting surveillance from a truck across the street.

Alex found P.C. a short time later surrounded by law enforcement officers, who were there to investigate another matter. The officers told Alex that P.C. had tried to climb into a fire truck. P.C. then scaled and jumped over a six to seven foot gate, ran around the secured parking area behind the gate for a minute, then jumped back over. Alex told the police that his mother was on her way and they were going to take P.C. to a hospital. The police let P.C. go with Alex.

As Alex led P.C. back to the apartment, P.C. tried to get into moving vehicles as they drove by. When they passed a steel-framed parking garage gate with wire mesh grilles, P.C. punched through three of the grilles and knocked them out. P.C. also punched a truck and was hopping around on one foot, clapping above his head,

---

[3] Id. at 11.

sticking his tongue out, making weird noises, and chewing on a cigar as if it were chewing tobacco.

Back in the apartment, P.C. took a shower while continuing to throw things and carry on one-sided conversations with the CIA. When their mother arrived, P.C. refused to take the elevator downstairs. In the stairwell, he created a "huge hole in the drywall" by slamming a door into the wall.[4]

Enroute to the hospital, P.C. would not wear a seatbelt, insisted on having the music turned up to full volume, and was screaming loudly. When they arrived at the emergency room, P.C. tried to introduce himself to the people there by trying to shake hands and saying, "Email me."[5] Then, in the waiting room, he picked up a wheelchair and threw it. P.C. then threw a small table, stormed off, and punched at the sliding glass doors.

On April 2, 2013, mental health treatment providers of Fairfax Hospital filed a 14-day involuntary treatment petition under chapter 71.05 RCW alleging that P.C. suffered from a mental disorder and that, as a result, he presented a likelihood of serious harm to others and/or the property of others.[6]

After hearing the testimony of Alex, a clinical psychologist, and P.C. at the commitment hearing, the court determined that P.C. had a mental disorder and as a result, he presented a substantial risk to the property of others. The court also found

---

[4] RP (Apr. 2, 2013) at 18.

[5] Id. at 19.

[6] The petition also alleged that P.C. was gravely disabled, but the trial court did not find the evidence sufficient to establish that P.C.'s health and safety needs were in jeopardy.

that a less restrictive alternative to inpatient treatment was not available. The court entered written findings of fact and conclusions of law and ordered P.C. to undergo involuntary treatment for a period not to exceed 14 days. P.C. appeals.

## ANALYSIS

As a preliminary matter, although the 14-day commitment order at issue has long since expired, the State has not argued that this case is moot. P.C. contends that the case is not moot because a reversal would restore his right to possess a firearm. In addition, we note that the superior court's order may have adverse consequences on future involuntary treatment determinations.[7] Under these circumstances, we exercise our discretion to decide the appeal on the merits.

### Right to Self-Representation

During the commitment hearing, after Alex testified on direct examination, P.C.'s attorney said he had no questions for Alex on cross-examination. The following exchange then occurred between P.C. and the court:

| | |
|---|---|
| RESPONDENT: | Can I remove him? Can I represent myself? |
| COURT: | Well, not at the current time. If you have a question you wanted him to ask, why don't you talk to the attorney and maybe he'll ask it for you. |
| RESPONDENT: | Okay. Well, I'm going to go to the bathroom first. |
| | . . . . |
| COURT: | So if you have a question, talk to your attorney. We won't listen. And that will be fine. |

---

[7] See In re Det. of M.K., 168 Wn. App. 621, 625-30, 279 P.3d 897 (2012).

[DEFENSE COUNSEL]: I think we're good, Your Honor.[8]

P.C. argues that the trial court misadvised him that he had no right to represent himself in the involuntary commitment proceeding and unjustifiably denied his request summarily without considering the relevant factors when a motion to proceed pro se is made after the hearing or trial has commenced.[9]

As Division Two of this court has previously determined, the right to represent oneself in the criminal context equally applies in the context of involuntary commitment proceedings.[10] But, as in the criminal context, the court indulges in every reasonable presumption against the defendant's waiver of right to counsel.[11]

The right to self-representation is neither absolute nor self-executing.[12] A court bears no affirmative duty to inform a defendant that he has such a right.[13] The defendant must personally seek to exercise the right, especially considering that its exercise will almost always be detrimental.[14] As such, a request to proceed pro se must be both timely and unequivocal.[15] Where a request for self-representation is

---

[8] RP (Apr. 2, 2013) at 21.

[9] See State v. Fritz, 21 Wn. App. 354, 363, 585 P.2d 173 (1978) (relevant factors include the quality of defense counsel's representation, the reasons for the request, and the potential disruption of the proceedings).

[10] In re Det. of J.S., 138 Wn. App. 882, 890-91, 159 P.3d 435 (2007).

[11] In re Det. of Turay, 139 Wn.2d 379, 396, 986 P.2d 790 (1999) (quoting Brewer v. Williams, 430 U.S. 387, 404, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977)).

[12] State v. Madsen, 168 Wn.2d 496, 504, 229 P.3d 714 (2010); State v. Woods, 143 Wn.2d 561, 586, 23 P.3d 1046 (2001).

[13] State v. Garcia, 92 Wn.2d 647, 654-55, 600 P.2d 1010 (1979).

[14] Id.

[15] State v. Stenson, 132 Wn.2d 668, 737, 940 P.2d 1239 (1997).

untimely, "the right is relinquished and the matter of the defendant's representation is left to the discretion of the trial judge."[16] "Even when a request is unequivocal, a defendant may still waive the right of self-representation by subsequent words or conduct."[17] We review the entire record in evaluating the trial court's decision for an abuse of discretion.[18]

The trial court did not misadvise P.C. about the right to self-representation, nor unreasonably deny such a request. The trial court reasonably interpreted P.C.'s outburst midway through the brief commitment hearing as an expression of disagreement with the strategy of his counsel at that moment.[19] The court appropriately twice offered P.C. the opportunity to consult with counsel to clarify whether there was an issue of contention. P.C. declined to avail himself of that opportunity and did not raise the matter again. Under these circumstances, the trial court did not abuse its discretion in determining that P.C. was not affirmatively seeking to exercise the right to represent himself and therefore was not required to undertake a colloquy or otherwise affirmatively advise him of his rights.

*Sufficiency of the Evidence*

In general, an individual may be involuntarily committed for mental health treatment if, as a result of a mental disorder, the individual either (1) poses a

---

[16] State v. DeWeese, 117 Wn.2d 369, 377, 816 P.2d 1 (1991).

[17] State v. Vermillion, 112 Wn. App. 844, 851, 51 P.3d 188 (2002).

[18] DeWeese, 117 Wn.2d at 378.

[19] See Woods, 143 Wn.2d at 587 (pro se request made in the context of expressing displeasure with one's counsel often indicates that the request is equivocal); see also State v. Luvene, 127 Wn.2d 690, 698-99, 903 P.2d 960 (1995) (accord).

6

substantial risk of harm to him or herself, others, or the property of others, or (2) is gravely disabled.[20] In this case, the commitment order was based upon a finding that P.C. presented a substantial risk of harm to the property of others. P.C. challenges the sufficiency of the evidence supporting this finding.

To order the involuntary commitment, the court had to find, by a preponderance of the evidence, that P.C. posed a substantial risk to the property of others "as evidenced by behavior which has caused *substantial* loss or damage to the property of others."[21] Where the trial court has weighed the evidence, our review is generally "limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment."[22]

P.C. does not dispute the evidence that he caused damage to the property of others as a result of a mental disorder. He claims, however, that no evidence supports the court's determination that his behavior caused "substantial" loss or damage. He argues that according to Alex's testimony, the only property damage he caused was a hole in the drywall of the apartment stairwell and knocking out some grilles in a metal gate. He points out that there was no testimony to establish the value of the property or cost of the damage from which the court could have determined there was substantial loss or damage. P.C. admits that the statute does not assign any particular monetary value, but suggests that loss of $100,000 might

---

[20] RCW 71.05.240(3); In re Detention of LaBelle, 107 Wn.2d 196, 201-02, 728 P.2d 138 (1986).

[21] RCW 71.05.020(25)(a)(iii) (emphasis added); RCW 71.05.240(3).

[22] LaBelle 107 Wn.2d at 209.

be considered substantial. The authority on which he relies to support this figure, Hegewald v. Neal, involves a partition action and a comparison of the value of land if partitioned or kept intact.[23] But "substantial pecuniary loss" for the purpose of evaluating partition of land versus a judicially-ordered sale has no application to a commitment order under the Involuntary Treatment Act and is not helpful.

If we look to the dictionary definition of "substantial," as P.C. also suggests we might, our Supreme Court has approved of the following: "'considerable in amount, value, or worth.'"[24] The evidence here reveals a considerable amount of damages. In addition to the damage P.C. acknowledges to the apartment stairwell and the parking garage gate, there was also evidence that he smashed a chair that did not belong solely to him and punched a car. And although there was no specific testimony about damage to the wheelchair, table and sliding doors, these items were the property of the hospital and a reasonable trier of fact could infer that the property sustained some amount of damage.[25] Even without an estimate of the cost of repair or a detailed description of the exact damage, the record reveals that P.C. inflicted a considerable amount of damage to the property of others. Accordingly, because the trial court's finding that P.C. presented a likelihood of serious harm to the property of

---

[23] 20 Wn. App. 517, 526, 582 P.2d 529 (1978).

[24] State v. McKague, 172 Wn.2d 802, 806, 262 P.3d 1225 (2011) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (2002)).

[25] P.C. also threw several items out of the fifth floor window and some of those items shattered. However, P.C. said that the things were "primarily" his, and the court found that ownership of the property was not clearly established. RP (Apr. 2, 2013) at 52.

others is supported by substantial evidence in the record, we affirm the involuntary treatment order.

WE CONCUR: