# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of | No. 57563-9-II |
| B.R., | |
| Appellant. | UNPUBLISHED OPINION |

CRUSER, J. — BR was involuntarily committed based on a civil conversion following the dismissal of his charges of assault in the second degree and felony malicious harassment. BR appeals a trial court order extending his involuntary commitment for an additional 180 days of mental health treatment. BR argues that the trial court erred by finding that his request to proceed pro se was not made knowingly, voluntarily, and intelligently. He also argues that the State failed to prove that he was gravely disabled and that there was not an appropriate less restrictive alternative (LRA) placement. Three hearings were held in this matter: one regarding BR's motion to proceed pro se, one regarding the State's petition for an extension of 180 days of involuntary treatment, and one regarding BR's motion for revision of the trial court's findings and order granting the State's petition.

We hold that (1) the trial court acted within its discretion in finding that BR did not make a knowing, voluntary, and intelligent waiver of his right to counsel; (2) the trial court's finding of grave disability is supported by clear, cogent, and convincing evidence, and; (3) even if the trial court erred in finding BR to be gravely disabled, the involuntary commitment should still be

affirmed because the trial court properly found that there was a substantial likelihood that BR would repeat the criminal conduct that formed the basis of the criminal charges that led to the commitment order. Finally, we decline to address BR's assertion that the evidence did not support a finding that an LRA placement was not in his best interest, because he presents no argument related to this issue.

## FACTS

### I. CRIMINAL CASE & DISMISSAL OF CHARGES

BR is 34 years old and has schizoaffective disorder. In 2017, BR was charged with assault in the second degree and felony malicious harassment pertaining to an incident between BR and his father. Both charges were classified as domestic violence. Because BR was found to be incompetent to stand trial and unlikely to be restored to competency, the charges were dismissed without prejudice and BR was admitted to Western State Hospital (WSH). The initial commitment hearing was held in May 2018, at which point the court "made a special finding that the underlying offense was a violent offense under RCW 9.94A.030." Clerk's Papers (CP) at 34. The felony charges were dismissed, and BR remained "in custody pursuant to RCW 71.05.280(3) and as a result of a behavioral health disorder continue[d] to present a substantial likelihood of repeating acts similar to the charged criminal behavior." *Id.* This latest admission was BR's fifth admission to WSH since 2011.

### II. PETITION FOR EXTENDING INVOLUNTARY TREATMENT

In August 2022, WSH doctors petitioned the superior court for an additional 180 days of involuntary treatment for BR. The doctors, Peter Bingcang, M.D., and Rosario Archer, Ph.D.,

alleged in their petition that BR remained gravely disabled under RCW 71.05.020(25)(b), and was not ready for an LRA to involuntary treatment at WSH.[1]

In a previous petition to extend BR's involuntary treatment, WSH doctors reported that BR "continued to be symptomatic," exhibited unstable mood, as well as "somatic delusions, poor insight, and judgment, and had poor attendance and participation in treatment." *Id.* at 5-6. In August 2019, BR's symptoms appeared to improve when he was transferred to a different ward. However, by April 2020, his condition reportedly worsened according to observations during an annual psychiatric evaluation. The evaluation indicated that BR had begun talking to himself, pacing frequently, and was refusing his medication. Treatment records indicated that BR "was not attending to his hygiene, responding to internal stimuli throughout the day and exhibiting acute symptoms of his mental health disorder." *Id.* at 7. By June 2021, WSH staff were concerned that BR presented a danger to others, and a "forced medication order was approved on [September 10, 2021]." *Id.* Hospital records indicated that BR "continued presenting auditory hallucinations, emotional dysregulation, impaired judgement, lack of insight and disorganized thinking," and he exhibited violent and aggressive behavior towards staff. *Id.*

In the current petition, Dr. Bingcang and Dr. Archer outlined BR's lack of progress towards treatment goals. When asked to provide his age and place of birth, BR "indicated having two different places of birth with two different dates of birth. He stated that one is in Portugal . . . and his second place of birth is New Hampshire." *Id.* at 9. Additionally, during the exam, BR reportedly

---

[1] The legislature has amended RCW 71.05.020 multiple times since the time of BR's commitment, but these amendments did not affect the portion of the statute relevant to this case; therefore, we cite to the current version. *See* LAWS OF 2023, ch. 433, § 3; LAWS OF 2023, ch. 425, § 20; LAWS OF 2022, ch. 210, § 1.

exhibited "a massive flow of delusional thinking, [and] irrational thoughts with grandiose perception of reality." *Id.* at 10. BR made statements about having "a huge house," "lots of money in the bank," and a girlfriend in Delaware whom he claimed to visit often and have a " 'pretty steady relationship' " with. *Id.* According to the doctors, none of these statements were true. The doctors also reported that BR's "judgment is impaired. . . . [b]ased on his descriptions about how he would manage reality, he appears to lack the capacity to make appropriate decisions to respond in an assertive manner in social situations." *Id.* Additionally, BR indicated that he did not believe his diagnosis and thought that he would not need to continue taking medications once he was discharged. He is described by WSH staff as a " 'flight risk [with a] history of aggressive and assaultive behavior,' " which includes numerous incidents of making racist and derogatory statements towards hospital staff. *Id.* at 11.

Although BR remained polite, cooperative, and calm during the exam, the doctors maintained in their petition that BR requires continued treatment at WSH because his "overall behavioral status remains dysregulated, grounded by mood symptoms of his schizoaffective disorder . . . [h]e has caused several assaultive incidents towards staff . . . [and] lack[s] volitional control leading him to aggression toward people." *Id.* at 16. The doctors opined that if BR were discharged to an LRA, he "would be at an increased likelihood of repeating similar acts to those of the index offense due to mental illness." *Id.* at 17.

## III. PRELIMINARY HEARING: BR'S MOTION TO PROCEED PRO SE

Prior to the hearing on the petition to extend BR's involuntary treatment for 180 days, the superior court held a hearing on BR's motion to proceed pro se. The court engaged in a colloquy

with BR, in order to determine whether his request to forgo the assistance of counsel was made on a "knowing, voluntary, and intelligent basis." Verbatim Rep. of Proc. (VRP) (Sep. 1, 2022) at 5.

Out of a desire to maintain his privacy, BR declined to answer a number of the court's questions regarding his education, previous legal experience, and familiarity with court rules and procedure. When asked about his familiarity with the rules of civil procedure, BR stated that he had experience applying the rules of civil procedure because he had been married before. In discussing the legal definition of grave disability, BR said that it meant "[n]ot being able to take care of himself, . . . not being able to feed yourself, . . . not being able to take your own medication, not being able to exercise." *Id.* at 12. BR further stated that WSH was required to prove that BR was a threat, violent, and suicidal in order to succeed in its petition for extended involuntary treatment.

After the colloquy, the superior court found that BR was competent to make the decision to proceed pro se. However, the court ultimately denied BR's request to waive counsel, finding that it was not made knowingly, voluntarily, or intelligently. In explaining this decision, the court expressed concern "based on [BR's] inability to understand or command or discuss in a meaningful way the rules of evidence, the rules of civil procedure, defenses that could be raised in opposition, or in support of [his] case." *Id.* at 14.

IV. INVOLUNTARY COMMITMENT HEARING

On September 15, 2022, the superior court held a hearing on the doctors' petition and request for a 180-day extension of involuntary treatment. Dr. Archer and BR were the only witnesses.

A. Dr. Archer's Testimony

Dr. Archer based her testimony on a mental health evaluation she conducted with BR, interviews with his treatment team, and a review of his record. At the hearing, Dr. Archer testified to her clinical opinion that BR has schizoaffective disorder as well as antisocial personality traits. She also mentions that in relation to his behavioral health disorders, BR has a history of using substances, namely, cannabis, alcohol, and cocaine. Dr. Archer explained that BR exhibited "distorted beliefs that are not congruent with reality," as well as unstable mood and impulse control issues. CP at 91. She testified that "[BR's] thinking process is impaired and limits his ability to develop and exercise judgment, [and] common sense," as well as his ability to resolve conflicts and seek help. *Id.* at 93. For example, BR stated that he has two different birthdates and two different places of birth, one in Portugal and one in New Hampshire. He also told Dr. Archer that he "constantly travels to the East Coast to visit his significant other," which is untrue. *Id.* He also has a history of conflicts and inappropriate interactions with care providers, did not appear to respect interpersonal and professional boundaries, and used inappropriate language with WSH staff.

Additionally, BR exhibited poor insight into his condition and need for treatment. He stated that if discharged from WSH, he would not continue taking his medication. Dr. Archer opined that BR would not seek follow-up mental health care if he were released due to his thought disorder, mood instability, and the acute symptoms of his condition.

In Dr. Archer's opinion, BR would not be able to ensure that his basic health and safety needs would be met if he were released from WSH. She explained that releasing him would place him at a high risk of serious harm and said that BR was "gravely disabled as a result of his behavioral health disorder." *Id.* at 96. Moreover, Dr. Archer testified that BR "presents a

6

substantial likelihood of repeating acts similar to the offenses he was charged with that were dismissed and that resulted in him being committed to Western State." *Id.* at 97. Dr. Archer explained that in order for BR to be ready for discharge from WSH, his treatment team would like to see BR gain insight into his mental health disorder, identify the symptoms that impact his mood and thoughts, and develop coping skills to help him manage his symptoms and avoid aggressive outbursts towards others.

B. BR's Testimony & Defense

BR testified briefly at the hearing. After being sworn in, before his counsel had the opportunity to ask him a question, BR immediately interrupted to express concerns about his court-appointed counsel. The court attempted to intervene to restore order and continue the direct examination of BR, but in response, BR continued to interrupt. He exhibited rapid and pressured speech while engaging with the court. BR was appearing via video, and when the court placed BR on mute in order to provide him with some preliminary information, BR grew agitated, slapped the computer, and stormed out of the room he was in at WSH.

Defense counsel asked the court to find that BR would not "have a problem maintaining his health and safety needs in the community." *Id.* at 105. Defense counsel argued that BR is adequately oriented to his surroundings and reality, and that his outbursts at WSH are only caused by his strong desire to leave the hospital.

C. Trial Court's Ruling

Based on the petitioners' report and testimony from Dr. Archer, the trial court found that the evidence was clear, cogent, and convincing that BR presented "a substantial likelihood of engaging in that type of repeat assaultive behavior as charged in the index offense." *Id.* at 108.

Additionally, the court found that BR was "still manifesting a severe deterioration in routine functioning shown by repeated escalating and significant loss of both cognitive and volitional control," due to his behavioral disorders. *Id.* The court explained that without continued treatment at WSH, BR would "not receive such care as is essential for his health and safety likely resulting in harmful consequences including decompensation, the ability to maintain shelter, nutrition, treatment, and resolve conflicts and safely navigate through the community with others." *Id.* at 108-09. Due to BR's inability to make rational decisions regarding treatment, as well as the deterioration of his mental functioning, the court determined that an LRA was "not presently in the best interest either of [BR] or the community." *Id.* at 109. Accordingly, the court granted the petition for an extension of 180 days of involuntary treatment.[2]

ANALYSIS

I. MOTION TO PROCEED PRO SE

BR argues that the trial court abused its discretion in denying his request to proceed pro se based on the court's opinion that BR had an inadequate understanding of the rules of civil procedure and evidence. BR relies on *State v. Madsen*, 168 Wn.2d 496, 505, 229 P.3d 714 (2010), to argue that "[a] court may not deny a motion for self-representation on the grounds that the self-representation would be detrimental to the defendant's ability to present his case." Br. of Appellant

---

[2] BR filed a motion to revise this ruling, which was made by a superior court commissioner. The motion was denied. Following a motion to revise a commissioner's order, we "review the superior court's ruling, not the commissioner's decision." *In re Det. of L.K.*, 14 Wn. App. 2d 542, 550, 471 P.3d 975 (2020). "[T]he findings and orders of a court commissioner not successfully revised become the orders and findings of the superior court." *Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017).

at 41. He maintains that the "trial court failed to establish on the record that B.R. did not make a knowing, voluntary, and intelligent waiver of his right to counsel." *Id.* at 42.

The State responds that the trial court acted within its discretion and "B.R. failed to demonstrate that he knowingly, voluntarily, and intelligently waived his right to counsel." Br. of Resp't at 12.

A. Legal Principles

We review a trial court's decision to deny a party's waiver of the right to counsel for abuse of discretion. *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 667, 260 P.3d 874 (2011). An abuse of discretion occurs when an order is " 'manifestly unreasonable or based on untenable grounds.' " *Id.* (internal quotation marks omitted) (quoting *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009)).

Trial courts apply a two-step procedure in determining whether to grant a motion to proceed pro se. *In re Det. of J.S.*, 138 Wn. App. 882, 895, 159 P.3d 435 (2007). "First, the trial court must determine if the person is competent to decide whether to waive his right to counsel. Second, if the trial court finds the person competent, then it must determine whether the person is waiving counsel knowingly, voluntarily, and intelligently." *Id.* As it relates to the first step—competency—former RCW 10.77.020(1) (2006) provides guidelines for this determination. The guidelines for determining competency to waive counsel include looking to whether the person makes their waiver while understanding "[t]he nature of the charges . . . [t]he range of allowable punishments . . . [p]ossible defenses . . . [and] [a]ll other facts essential to a broad understanding of the whole matter." former RCW 10.77.020(1).

9

With regard to the second step—whether a person knowingly, voluntarily, and intelligently waived the assistance of counsel—a party does not need the legal education or experience of a lawyer. However, they "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, 87 L. Ed. 268 (1942)). The preferred method for determining whether a party's request to proceed pro se is made knowingly, voluntarily, and intelligently is through a colloquy on the record. *State v. DeWeese*, 117 Wn.2d 369, 378, 816 P.2d 1 (1991). No checklist exists to determine the validity of a waiver of the right to counsel. *Id*. The validity of a waiver depends on the unique facts and circumstances of the case. *Id*.

B. Application

*1. BR's Request was not Made Knowingly, Voluntarily, and Intelligently*

Here, the trial court applied the two-step analysis and, after considering the factors from former RCW 10.77.020(1), found that BR was competent to waive counsel. Neither party on appeal disputes this finding. However, the trial court further found that BR's attempted waiver of counsel was not knowing, voluntary, and intelligent, and denied BR's motion to proceed pro se. The superior court reached this conclusion after engaging in a colloquy with BR. The court concluded that BR "lack[ed] an understanding of the Rules of Evidence, the Rules of Civil Procedure, the hospital's burden of proof on its [p]etition; and of legal defenses to the [p]etition." CP at 28.

When asked to briefly describe the defenses that BR would make in his case, he simply said "Swisher v. Phillig," and then later clarified that he meant "Swisher v. Phillips." Verbatim Report of Proceedings (VRP) (Sept. 1, 2022) at 13-14. He did not mention or explain any other potential defenses. Rather than demonstrating an understanding of the appropriate legal definition of grave disability, BR provided a more general understanding of what a physical disability means in the colloquial sense. He was also unable to name the elements that WSH would need to prove in its case. On balance, we cannot say that the trial court abused its discretion in denying BR's motion to proceed without counsel based on its conclusion that BR's proposed waiver of counsel was not knowing, voluntary, and intelligent.

In conducting a colloquy with BR, the trial court found that BR's proposed waiver was not valid. The trial court based this finding on an assessment of BR's understanding of the rules of civil procedure, the rules of evidence, legal defenses to the petition, and the hospital's burden of proof. We find that the trial court did not abuse its discretion in denying BR's motion to proceed pro se.

*2. BR's Request was Equivocal*

Even if this court were to find that BR's request to proceed pro se was made knowingly, voluntarily, and intelligently, the conditional and equivocal nature of his request provides an alternative and additional basis to affirm the trial court's denial of the request. We may affirm the trial court on any ground presented in the record. *Mancini v. City of Tacoma*, 196 Wn.2d 864, 877, 479 P.3d 656 (2021).

"The right to proceed pro se is neither absolute nor self-executing." *Madsen*, 168 Wn.2d at 504. For a defendant's request to proceed pro se to be granted, it must be made unequivocally.

11

*State v. Curry*, 191 Wn.2d 475, 482-83, 423 P.3d 179 (2018). Meaning that a defendant must " 'make an explicit choice between exercising the right to counsel and the right to self-representation so that a court may be reasonably certain that the defendant wishes to represent [themselves].' " *Id*. at 490 (quoting *United States v. Arlt*, 41 F.3d 516, 519 (9th Cir. 1994)). The fact that a request that is made conditionally, as an alternative to substitution of counsel, does not necessarily render it equivocal. *State v. Stenson*, 132 Wn.2d 668, 740–41, 940 P.2d 1239 (1997). However, "such a request may be an indication to the trial court, in light of the whole record, that the request is not unequivocal." *Id.* at 741.

When the court first asked BR during the colloquy why he wished to represent himself, BR responded "I disagree with the practices of Paul O'Brien." VRP (Sept. 1, 2022) at 6. BR went on to list the many reasons why he was dissatisfied with his representation. He told the court that he had sought to request a new attorney many times. After the colloquy was over, and the court determined that Mr. O'Brien would continue to represent BR in the proceeding, BR said, "I'd like to be able to still speak after Paul O'Brien [ ] speaks because . . . I don't like Paul O'Brien." *Id.* at 17.

BR's request to proceed pro se was an alternative to his previous requests for substitution of counsel. The request was conditional, and on the whole, the record does not show that it was unequivocal. The fact that his request was equivocal further supports this court's conclusion that the trial court acted within its discretion in denying BR's motion to proceed pro se.

II. SUBSTANTIAL EVIDENCE OF A GRAVE DISABILITY

BR argues that the evidence presented in the petition and at the September 15, 2022 hearing was insufficient to establish that he was gravely disabled under RCW 71.05.020(25)(b), the prong

of the statute under which the State sought the commitment order. He claims that no evidence was presented to show a severe deterioration in routine functioning, nor a repeated and escalating loss of cognitive or volitional control over his actions, nor a refusal to receive essential care. He claims that the physicians' opinion did "not establish worsening or decomposition reaching a level of causing or risking danger of physical harm." Br. of Appellant at 25.

The State responds that the record presented sufficient evidence for the trial court to find that BR is gravely disabled under prong (b) of the statute. The State points to records of BR's "severe symptomology, poor insight into his mental health, and recent need for measures of restraints to control behavior while in the hospital for his and others' safety." Br. of Resp't at 31.

A. Legal Principles

*1. Standard of Review & Sufficiency of Evidence*

A person who was committed for involuntary mental health treatment shall be released at the completion of the designated treatment period "unless the superintendent or professional person in charge of the facility in which he or she is confined, . . . files a new petition for involuntary treatment on the grounds that the committed person . . . [c]ontinues to be gravely disabled." RCW 71.05.320(4)(d). The statute defines "gravely disabled" as

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25). The trial court found BR gravely disabled under prong (b).

The State has the burden of proving that a person is gravely disabled by clear, cogent, and convincing evidence. *In re Det. of R.H.*, 178 Wn. App. 941, 945-46, 316 P.3d 535 (2014). This

standard means that the State must show that it is "highly probable" that the person is gravely disabled. *In re Det. of Labelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). On appeal, we "will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *Id*. " 'Substantial evidence' is the quantum of evidence sufficient to persuade a fair-minded person." *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015). When considering if there was sufficient evidence, we view the evidence in the light most favorable to the petitioner. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019). We must defer to the trier of fact on the persuasiveness of the evidence and witness credibility. *In re Vulnerable Adult Pet. for Knight*, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014).

To order involuntary commitment under subsection (b), the court must find: (1) "a recent proof of loss of cognitive or volitional control . . . due to [a] mental disorder," (2) inability "to make a rational choice about treatment due to [ ] lack of insight into [the patient's] condition," and (3) "a factual basis for concluding that [the patient] would not receive essential care if [they] were released." *In re Det. of D.W.*, 6 Wn. App. 2d 751, 757, 431 P.3d 1035 (2018).

B. Application

Here, the trial court properly applied the standard set forth in *LaBelle* when it determined that BR was gravely disabled. *LaBelle*, 107 Wn.2d at 208-10. The evidence before the trial court showed that BR had poor insight into his condition, refusing to believe that he suffered from schizoaffective disorder and stating that he planned to stop taking his medication upon discharge. He exhibited delusional thinking, believing that he had two birth dates, two places of birth, and frequently traveled to the east coast to visit his significant other during his commitment at WSH.

BR engaged in conflicts, behaved inappropriately, and failed to respect boundaries with WSH staff and his care providers. He exhibited "erratic behavior, aggression, and required use of restraints." CP at 36. Additionally, he exhibited agitation, as well as rapid and pressured speech, and acted inappropriately during his hearing, which he barely testified at due to increased agitation and frustration.

Accordingly, the trial court relied on sufficient evidence when it concluded that BR would not be able to "independently meet his essential needs of health and safety due to his psychiatric symptoms," which "prevent him from being able to independently maintain medication and treatment, shelter, conflict resolution, or other essential activities of health and safety." *Id.*

We affirm the trial court's finding that BR was gravely disabled.[3]

III: LESS RESTRICTIVE ALTERNATIVE

BR contends that "[t]he state failed to prove there is no [Less] Restrictive Alternative (LRA) to WSH." Br. of Appellant at 1. However, BR makes no further argument regarding this assignment of error, nor does he offer any support for this assertion in the remainder of his brief. Under the RAP 10.3(a)(6), a brief submitted by either party should contain "the argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record," all of which BR's brief lacks. Additionally, "[w]e do not consider conclusory arguments that are unsupported by citation to authority." *Brownfield v. City of Yakima*, 178 Wn. App. 850, 876, 316 P.3d 520 (2014). "It is not the responsibility of this court to attempt to discern what it is appellant may have intended to assert that might somehow have merit." *Port*

---

[3] BR was also committed on the basis of the trial court's finding that he was substantially likely to repeat acts similar to his crimes if released. RCW 71.05.320(4)(c)(ii). BR has not challenged this finding, rendering it a verity on appeal.

No. 57563-9-II

*Susan Chapel of the Woods v. Port Susan Camping Club*, 50 Wn. App. 176, 188, 746 P.2d 816 (1987). And " '[p]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.' " *In re Guardianship of Ursich*, 10 Wn. App. 2d 263, 278, 448 P.3d 112 (2019) (quoting *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998)).

Because BR's assignment of error fails to comply with RAP 10.3(a)(6), we decline to address it. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

We affirm the trial court's order granting the petition to extend BR's involuntary treatment at WSH for an additional 180 days.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

GLASGOW, C.J.

CHE. J.

16